# CALIFORNIA COASTAL COMMISSION ET AL. *v.* GRANITE ROCK CO.

No. 85–1200. Argued December 2, 1986—Decided March 24, 1987

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, and in Parts I and II of which POWELL and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 594. SCALIA, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 607.

*Linus Masouredis*, Deputy Attorney General of California, argued the cause for appellants. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Andrea Sheridan Ordin*, Chief Assistant Attorney General, *N. Gregory Taylor*, Assistant Attorney General, and *Joseph Barbieri*, Deputy Attorney General.

*Barbara R. Banke* argued the cause for appellee. With her on the brief were *Jess S. Jackson, Burton J. Goldstein, James G. Heisinger, Jr.*, and *Janet A. Econome*.

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Peter R. Steenland, Jr.*, and *Anne S. Almy*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alaska et al. by *Harold M. Brown*, Attorney General of Alaska, *Jim Smith*, Attorney General of Florida, *Robert K. Corbin*, Attorney General of Arizona, *Corinne K. A. Watanabe*, Attorney General of Hawaii, *James*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether Forest Service regulations, federal land use statutes and regulations, or the Coastal Zone Management Act of 1972 (CZMA), 16 U. S. C. § 1451 *et seq.* (1982 ed. and Supp. III), pre-empt the California Coastal Commission's imposition of a permit requirement on operation of an unpatented mining claim in a national forest.

I

Granite Rock Company is a privately owned firm that mines chemical and pharmaceutical grade white limestone. Under the Mining Act of 1872, 17 Stat. 91, as amended, 30 U. S. C. § 22 *et seq.*, a private citizen may enter federal lands to explore for mineral deposits. If a person locates a valuable mineral deposit on federal land, and perfects the claim by properly staking it and complying with other statutory requirements, the claimant "shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations," 30 U. S. C. § 26, although the United States retains title to the land. The holder of a perfected mining claim may secure a patent to the land by com-

T. Jones, Attorney General of Idaho, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Brian McKay*, Attorney General of Nevada, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *W. J. Michael Cody*, Attorney General of Tennessee, *David L. Wilkinson*, Attorney General of Utah, *Kenneth O. Eikenberry*, Attorney General of Washington, *Paul Bardacke*, Attorney General of New Mexico, *William J. Guste, Jr.*, Attorney General of Louisiana, *Michael T. Greely*, Attorney General of Montana, *David B. Frohnmayer*, Attorney General of Oregon, *Mark V. Meierhenry*, Attorney General of South Dakota, *Jim Mattox*, Attorney General of Texas, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Archie G. McClintock*, Attorney General of Wyoming, and *John D. Leshy*; for the Council of State Governments et al. by *Benna Ruth Solomon* and *Joyce Holmes Benjamin*; and for the Big Sur Foundation et al. by *Barry P. Goode* and *Christopher Berka*.

  Briefs of *amici curiae* urging affirmance were filed for the Alaska Miners Association et al. by *Ronald A. Zumbrun* and *Robin L. Rivett*; and for the American Mining Congress by *Mary Jane C. Due*.

plying with the requirements of the Mining Act and regulations promulgated thereunder, see 43 CFR § 3861.1 *et seq.* (1986), and, upon issuance of the patent, legal title to the land passes to the patent holder. Granite Rock holds unpatented mining claims on federally owned lands on and around Mount Pico Blanco in the Big Sur region of Los Padres National Forest.

From 1959 to 1980, Granite Rock removed small samples of limestone from this area for mineral analysis. In 1980, in accordance with federal regulations, see 36 CFR § 228.1 *et seq.* (1986), Granite Rock submitted to the Forest Service a 5-year plan of operations for the removal of substantial amounts of limestone. The plan discussed the location and appearance of the mining operation, including the size and shape of excavations, the location of all access roads, and the storage of any overburden. App. 27–34. The Forest Service prepared an Environmental Assessment of the plan. *Id.,* at 38–53. The Assessment recommended modifications of the plan, and the responsible Forest Service Acting District Ranger approved the plan with the recommended modifications in 1981. *Id.,* at 54. Shortly after Forest Service approval of the modified plan of operations, Granite Rock began to mine.

Under the California Coastal Act (CCA), Cal. Pub. Res. Code Ann. § 30000 *et seq.* (West 1986), any person undertaking any development, including mining, in the State's coastal zone must secure a permit from the California Coastal Commission. §§ 30106, 30600. According to the CCA, the Coastal Commission exercises the State's police power and constitutes the State's coastal zone management program for purposes of the federal CZMA, described *infra,* at 589–590. In 1983 the Coastal Commission instructed Granite Rock to apply for a coastal development permit for any mining undertaken after the date of the Commission's letter.[1]

---

[1] The Coastal Commission also instructed Granite Rock to submit a certification of consistency pursuant to the consistency review process of the CZMA, 16 U. S. C. § 1456(c)(3)(A), described *infra,* at 590–591. The

Granite Rock immediately filed an action in the United States District Court for the Northern District of California seeking to enjoin officials of the Coastal Commission from compelling Granite Rock to comply with the Coastal Commission permit requirement and for declaratory relief under 28 U. S. C. § 2201 (1982 ed., Supp. III). Granite Rock alleged that the Coastal Commission permit requirement was pre-empted by Forest Service regulations, by the Mining Act of 1872, and by the CZMA. Both sides agreed that there were no material facts in dispute. The District Court denied Granite Rock's motion for summary judgment and dismissed the action. 590 F. Supp. 1361 (1984). The Court of Appeals for the Ninth Circuit reversed. 768 F. 2d 1077 (1985). The Court of Appeals held that the Coastal Commission permit requirement was pre-empted by the Mining Act of 1872 and Forest Service regulations. The Court of Appeals acknowledged that the statute and regulations do not "go so far as to occupy the field of establishing environmental standards," specifically noting that Forest Service regulations "recognize that a state may enact environmental regulations in addition to those established by federal agencies," and that the Forest Service "will apply [the state standards] in exercising its permit authority." 768 F. 2d, at 1083. However, the Court of Appeals held that "an independent state permit system to enforce state environmental standards would undermine the Forest Service's own permit authority and thus is pre-empted." *Ibid.*

The Coastal Commission appealed to this Court under 28 U. S. C. § 1254(2). We postponed consideration of the question of jurisdiction to the hearing of the case on the merits, 475 U. S. 1094 (1986).

## II

First we address two jurisdictional issues. In the course of this litigation, Granite Rock's 5-year plan of operations

Commission subsequently admitted that it had waived its right to review the 1981–1986 plan of operation under the CZMA consistency provision by failing to raise its right to review in a timely manner. App. 17.

expired. The controversy between Granite Rock and the Coastal Commission remains a live one, however, for two reasons. First, the Coastal Commission's 1983 letter instructed Granite Rock that a Coastal Commission permit was required for work undertaken after the date of the letter. App. 22–24. Granite Rock admitted that it has done work after that date. *Id.*, at 83. Because the Coastal Commission asserts that Granite Rock needed a Coastal Commission permit for the work undertaken after the date of the Commission's letter, the Commission may require "reclamation for the mining that [has] occurred, measures to prevent pollution into the Little Sur River." Tr. of Oral Arg. 8. Granite Rock disputes the Coastal Commission's authority to require reclamation efforts. Second, Granite Rock stated in answer to interrogatories that its "investments and activities regarding its valid and unpatented mining claims require continuing operation beyond the present Plan of Operations," and that it intended to conduct mining operations on the claim at issue "as long as [Granite Rock] can mine an economically viable and valuable mining deposit under applicable federal laws." App. 83–84. Therefore it is likely that Granite Rock will submit new plans of operations in the future. Even if future participation by California in the CZMA consistency review process, see *infra*, at 590–591, or requirements placed on Granite Rock by the Forest Service called for compliance with the conditions of the Coastal Commission's permit, dispute would continue over whether the Coastal Commission itself, rather than the Federal Government, could *enforce* the conditions placed on the permit. This controversy is one capable of repetition yet evading review. See *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 285, n. 3 (1986); *Dunn* v. *Blumstein*, 405 U. S. 330, 333, n. 2 (1972). Accordingly, this case is not moot.

The second jurisdictional issue we must consider is whether this case is properly within our authority, under 28 U. S. C. § 1254(2), to review the decision of a federal court

of appeals by appeal if a state statute is "held by a court of appeals to be invalid as repugnant to the Constitution, treaties or laws of the United States . . . ." Statutes authorizing appeals are to be strictly construed. *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 247 (1984); *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 43 (1983). As noted in *Silkwood, supra,* at 247, "we have consistently distinguished between those cases in which a state statute is expressly struck down" as repugnant to the Constitution, treaties, or laws of the United States, and those cases in which "an exercise of authority under state law is invalidated without reference to the state statute." This latter group of cases do not fall within this Court's appellate jurisdiction.

In the present case, the Court of Appeals held that the particular exercise of the Coastal Commission permit requirement over Granite Rock's operation in a national forest was pre-empted by federal law. The Court of Appeals did not invalidate any portion of the CCA. In fact, it did not discuss whether the CCA itself actually authorized the imposition of a permit requirement over Granite Rock. See Cal. Pub. Res. Code Ann. § 30008 (West 1986) (limiting jurisdiction over federal lands to that which is "consistent with applicable federal . . . laws"). Accordingly this case is one in which "an exercise of authority under state law is invalidated without reference to the state statute," *Silkwood, supra,* at 247, and not within our § 1254(2) appellate jurisdiction. We therefore treat the jurisdictional statement as a petition for certiorari, 28 U. S. C. § 2103, and having done so, grant the petition and reverse the judgment of the Court of Appeals.

## III

Granite Rock does not argue that the Coastal Commission has placed any particular conditions on the issuance of a permit that conflict with federal statutes or regulations. Indeed, the record does not disclose what conditions the

Coastal Commission will place on the issuance of a permit. Rather, Granite Rock argues, as it must given the posture of the case, that there is no possible set of conditions the Coastal Commission could place on its permit that would not conflict with federal law—that any state permit requirement is *per se* pre-empted. The only issue in this case is this purely facial challenge to the Coastal Commission permit requirement.

The Property Clause provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U. S. Const., Art. IV, § 3, cl. 2. This Court has "repeatedly observed" that " '[t]he power over the public land thus entrusted to Congress is without limitations.' " *Kleppe* v. *New Mexico*, 426 U. S. 529, 539 (1976), quoting *United States* v. *San Francisco*, 310 U. S. 16, 29 (1940). Granite Rock suggests that the Property Clause not only invests unlimited power in Congress over the use of federally owned lands, but also exempts federal lands from state regulation whether or not those regulations conflict with federal law. In *Kleppe*, 426 U. S., at 543, we considered "totally unfounded" the assertion that the Secretary of the Interior had even proposed such an interpretation of the Property Clause. We made clear that "the State is free to enforce its criminal and civil laws" on federal land so long as those laws do not conflict with federal law. *Ibid.* The Property Clause itself does not automatically conflict with all state regulation of federal land. Rather, as we explained in *Kleppe*:

> "Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power *to enact legislation* respecting those lands pursuant to the Property Clause. *And when Congress so acts*, the federal legislation necessarily overrides conflicting state laws under

the Supremacy Clause." *Ibid.* (citations omitted) (emphasis supplied).

We agree with Granite Rock that the Property Clause gives Congress plenary power to legislate the use of the federal land on which Granite Rock holds its unpatented mining claim. The question in this case, however, is whether Congress has enacted legislation respecting this federal land that would pre-empt any requirement that Granite Rock obtain a California Coastal Commission permit. To answer this question we follow the pre-emption analysis by which the Court has been guided on numerous occasions:

> "[S]tate law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. [*Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Comm'n*, 461 U. S. 190,] 203–204 [(1983)]; *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 153 (1982); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)." *Silkwood* v. *Kerr-McGee Corp.*, *supra*, at 248.

## A

Granite Rock and the United States as *amicus* have made basically three arguments in support of a finding that any possible state permit requirement would be pre-empted. First, Granite Rock alleges that the Federal Government's environmental regulation of unpatented mining claims in na-

tional forests demonstrates an intent to pre-empt any state regulation. Second, Granite Rock and the United States assert that indications that state land use planning over unpatented mining claims in national forests is pre-empted should lead to the conclusion that the Coastal Commission permit requirement is pre-empted. Finally, Granite Rock and the United States assert that the CZMA, by excluding federal lands from its definition of the coastal zone, declared a legislative intent that federal lands be excluded from all state coastal zone regulation. We conclude that these federal statutes and regulations do not, either independently or in combination, justify a facial challenge to the Coastal Commission permit requirement.

Granite Rock concedes that the Mining Act of 1872, as originally passed, expressed no legislative intent on the as yet rarely contemplated subject of environmental regulation. Brief for Appellee 31–32. In 1955, however, Congress passed the Multiple Use Mining Act, 69 Stat. 367, 30 U. S. C. § 601 *et seq.*, which provided that the Federal Government would retain and manage the surface resources of subsequently located unpatented mining claims. 30 U. S. C. § 612(b). Congress has delegated to the Secretary of Agriculture the authority to make "rules and regulations" to "regulate [the] occupancy and use" of national forests. 16 U. S. C. § 551. Through this delegation of authority, the Department of Agriculture's Forest Service has promulgated regulations so that "use of the surface of National Forest System lands" by those such as Granite Rock, who have unpatented mining claims authorized by the Mining Act of 1872, "shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 CFR §§ 228.1, 228.3(d) (1986). It was pursuant to these regulations that the Forest Service approved the Plan of Operations submitted by Granite Rock. If, as Granite Rock claims, it is the federal intent that Granite Rock conduct its mining unhindered by any state environmental regulation,

one would expect to find the expression of this intent in these Forest Service regulations. As we explained in *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 718 (1985), it is appropriate to expect an administrative regulation to declare any intention to pre-empt state law with some specificity:

> "[B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means, . . . we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to pre-empt."

Upon examination, however, the Forest Service regulations that Granite Rock alleges pre-empt any state permit requirement not only are devoid of any expression of intent to pre-empt state law, but rather appear to assume that those submitting plans of operations will comply with state laws. The regulations explicitly require all operators within the national forests to comply with state air quality standards, 36 CFR § 228.8(a) (1986), state water quality standards, § 228.8(b), and state standards for the disposal and treatment of solid wastes, § 228.8(c). The regulations also provide that, pending final approval of the plan of operations, the Forest Service officer with authority to approve plans of operation "will approve such operations as may be necessary for timely compliance with the requirements of Federal and *State laws* . . . ." § 228.5(b) (emphasis added). Finally, the final subsection of § 228.8, "[r]equirements for environmental protection," provides:

> "(h) Certification or other approval issued by *State agencies* or other Federal agencies of compliance with laws and regulations relating to mining operations will

be accepted as compliance with similar or parallel requirements of these regulations." (Emphasis supplied.)

It is impossible to divine from these regulations, which expressly contemplate coincident compliance with state law as well as with federal law, an intention to pre-empt all state regulation of unpatented mining claims in national forests. Neither Granite Rock nor the United States contends that these Forest Service regulations are inconsistent with their authorizing statutes.

Given these Forest Service regulations, it is unsurprising that the Forest Service team that prepared the Environmental Assessment of Granite Rock's plan of operation, as well as the Forest Service officer that approved the plan of operation, expected compliance with state as well as federal law. The Los Padres National Forest Environmental Assessment of the Granite Rock plan stated that "Granite Rock is responsible for obtaining any necessary permits which may be required by the California Coastal Commission." App. 46. The Decision Notice and Finding of No Significant Impact issued by the Acting District Ranger accepted Granite Rock's plan of operation with modifications, stating:

"The claimant, in exercising his rights granted by the Mining Law of 1872, shall comply with the regulations of the Departments of Agriculture and Interior. The claimant is further responsible for obtaining any necessary permits required by State and/or county laws, regulations and/or ordinance." *Id.*, at 54.

B

The second argument proposed by Granite Rock is that federal land management statutes demonstrate a legislative intent to limit States to a purely advisory role in federal land management decisions, and that the Coastal Commission permit requirement is therefore pre-empted as an impermissible state land use regulation.

In 1976 two pieces of legislation were passed that called for the development of federal land use management plans affecting unpatented mining claims in national forests. Under the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, 43 U. S. C. §1701 *et seq.* (1982 ed. and Supp. III), the Department of the Interior's Bureau of Land Management is responsible for managing the mineral resources on federal forest lands; under the National Forest Management Act (NFMA), 90 Stat. 2949, 16 U. S. C. §§ 1600–1614 (1982 ed. and Supp. III), the Forest Service under the Secretary of Agriculture is responsible for the management of the surface impacts of mining on federal forest lands. Granite Rock, as well as the Solicitor General, point to aspects of these statutes indicating a legislative intent to limit States to an advisory role in federal land management decisions. For example, the NFMA directs the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies," 16 U. S. C. § 1604(a). The FLPMA directs that land use plans developed by the Secretary of the Interior "shall be consistent with State and local plans to the maximum extent [the Secretary] finds consistent with Federal law," and calls for the Secretary, "to the extent he finds practical," to keep apprised of state land use plans, and to "assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans." 43 U. S. C. § 1712(c)(9).

For purposes of this discussion and without deciding this issue, we may assume that the combination of the NFMA and the FLPMA pre-empts the extension of state land use plans onto unpatented mining claims in national forest lands. The Coastal Commission[2] asserts that it will use permit con-

---

[2] Although the California Coastal Act requires local governments to adopt Local Coastal Programs, which include a land use plan and zoning

ditions to impose environmental regulation. See Cal. Pub. Res. Code Ann. § 30233 (West 1986) (quality of coastal waters); § 30253(2) (erosion); § 30253(3) (air pollution); § 30240(b) (impact on environmentally sensitive habitat areas).

While the CCA gives land use as well as environmental regulatory authority to the Coastal Commission, the state statute also gives the Coastal Commission the ability to limit the requirements it will place on the permit. The CCA declares that the Coastal Commission will "provide maximum state involvement in federal activities allowable under federal law or regulations . . . ." Cal. Pub. Res. Code Ann. § 30004 (West 1986). Since the state statute does not detail exactly what state standards will and will not apply in connection with various federal activities, the statute must be understood to allow the Coastal Commission to limit the regulations it will impose in those circumstances. In the present case, the Coastal Commission has consistently maintained that it does not seek to prohibit mining of the unpatented claim on national forest land. See 768 F. 2d, at 1080 ("The Coastal Commission also argues that the Mining Act does not preempt state environmental regulation of federal land *unless the regulation prohibits mining altogether . . .*") (emphasis supplied); 590 F. Supp., at 1373 ("The [Coastal Commission] seeks not to prohibit or 'veto,' but to regulate [Granite Rock's] mining activity in accordance with the detailed requirements of the CCA. . . . There is no reason to find that the [Coastal Commission] will apply the CCA's regulations so as to deprive [Granite Rock] of its rights under the Mining Act"); Defendants' Memorandum of Points

ordinance, see Cal. Pub. Res. Code Ann. §§ 30500, 30512, 30513 (West 1986), no Local Coastal Program permit requirement is involved in this case. The permit at issue in this litigation is issued by the Coastal Commission directly. §§ 30600(a), (c); Tr. of Oral Arg. 52 ("We're dealing with the second type of permitting, which is by the Coastal Commission itself, not a local government. . . . [T]he Coastal Commission issues permits based upon compliance with the environmental criteria in the Coastal Act itself").

and Authorities in Opposition to Plaintiff's Motion for Summary Judgment in No. C–83–5137 (ND Cal.), pp. 41–42. ("Despite Granite Rock's characterization of Coastal Act regulation as a 'veto' or ban of mining, Granite Rock has not applied for any coastal permit, and the State . . . has not indicated that it would in fact ban such activity. . . . [T]he question presented is merely whether the state can *regulate* uses rather than *prohibit* them. Put another way, the state is not seeking to *determine* basic uses of federal land: rather it is seeking to *regulate* a given mining use so that it is carried out in a more environmentally sensitive and resource-protective fashion").

The line between environmental regulation and land use planning will not always be bright; for example, one may hypothesize a state environmental regulation so severe that a particular land use would become commercially impracticable. However, the core activity described by each phrase is undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits. Congress has indicated its understanding of land use planning and environmental regulation as distinct activities. As noted above, 43 U. S. C. § 1712(c)(9) requires that the Secretary of the Interior's land use plans be consistent with state plans only "to the extent he finds practical." The immediately preceding subsection, however, requires that the Secretary's land use plans "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." § 1712(c)(8). Congress has also illustrated its understanding of land use planning and environmental regulation as distinct activities by delegating the authority to regulate these activities to different agencies. The stated purpose of part 228, subpart A of the Forest Service regulations, 36 CFR § 228.1

(1986), is to "set forth rules and procedures" through which mining on unpatented claims in national forests "shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." The next sentence of the subsection, however, declares that "[i]t is not the purpose of these regulations to provide for the management of mineral resources; the responsibility for managing such resources is in the Secretary of the Interior." Congress clearly envisioned that although environmental regulation and land use planning may hypothetically overlap in some instances, these two types of activity would in most cases be capable of differentiation. Considering the legislative understanding of environmental regulation and land use planning as distinct activities, it would be anomalous to maintain that Congress intended any state environmental regulation of unpatented mining claims in national forests to be *per se* pre-empted as an impermissible exercise of state land use planning. Congress' treatment of environmental regulation and land use planning as generally distinguishable calls for this Court to treat them as distinct, until an actual overlap between the two is demonstrated in a particular case.

Granite Rock suggests that the Coastal Commission's true purpose in enforcing a permit requirement is to prohibit Granite Rock's mining entirely. By choosing to seek injunctive and declaratory relief against the permit requirement before discovering what conditions the Coastal Commission would have placed on the permit, Granite Rock has lost the possibility of making this argument in this litigation. Granite Rock's case must stand or fall on the question whether *any possible* set of conditions attached to the Coastal Commission's permit requirement would be pre-empted. As noted in the previous section, the Forest Service regulations do not indicate a federal intent to pre-empt all state environmental regulation of unpatented mining claims in national forests. Whether or not state land use planning over unpatented mining claims in national forests is pre-empted, the Coastal Com-

mission insists that its permit requirement is an exercise of environmental regulation rather than land use planning. In the present posture of this litigation, the Coastal Commission's identification of a possible set of permit conditions not pre-empted by federal law is sufficient to rebuff Granite Rock's facial challenge to the permit requirement. This analysis is not altered by the fact that the Coastal Commission chooses to impose its environmental regulation by means of a permit requirement. If the Federal Government occupied the field of environmental regulation of unpatented mining claims in national forests—concededly not the case—then state environmental regulation of Granite Rock's mining activity would be pre-empted, whether or not the regulation was implemented through a permit requirement. Conversely, if reasonable state environmental regulation is not pre-empted, then the use of a permit requirement to impose the state regulation does not create a conflict with federal law where none previously existed. The permit requirement itself is not talismanic.

C

Granite Rock's final argument involves the CZMA, 16 U. S. C. § 1451 *et seq.* (1982 ed. and Supp. III), through which financial assistance is provided to States for the development of coastal zone management programs. Section 304(a) of the CZMA, 16 U. S. C. § 1453(1), defines the coastal zone of a State, and specifically excludes from the coastal zone "lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents." The Department of Commerce, which administers the CZMA, has interpreted § 1453(1) to exclude all federally owned land from the CZMA definition of a State's coastal zone. 15 CFR § 923.33(a) (1986).

Granite Rock argues that the exclusion of "lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or

agents" excludes all federally owned land from the CZMA definition of a State's coastal zone, and demonstrates a congressional intent to pre-empt any possible Coastal Commission permit requirement as applied to the mining of Granite Rock's unpatented claim in the national forest land.

According to Granite Rock, because Granite Rock mines land owned by the Federal Government, the Coastal Commission's regulation of Granite Rock's mining operation must be limited to participation in a consistency review process detailed in the CZMA. Under the CZMA, once a state coastal zone management program has been approved by the Secretary of Commerce for federal administrative grants, "any applicant for a required Federal license or permit to conduct an activity affecting land or water uses in the coastal zone of that state shall provide in the application . . . a certification that the proposed activity complies with the state's approved program and that such activity will be conducted in a manner consistent with the [state] program." 16 U. S. C. § 1456(c)(3)(A). At the same time, the applicant must provide the State a copy of the certification. The State, after public notice and appropriate hearings, is to notify the federal agency concerned that the State concurs or objects to the certification. If the State fails to notify the federal agency within six months of receiving notification, it is presumed that the State concurs. If the State neither concurs nor is presumed to concur, the federal agency must reject the application, unless the Secretary of Commerce finds that the application is consistent with the objectives of the CZMA or is "otherwise necessary in the interest of national security." *Ibid.*

In order for an activity to be subject to CZMA consistency review, the activity must be on a list that the State provides federal agencies, which describes the type of federal permit and license applications the State wishes to review. 15 CFR § 930.53 (1986). If the activity is unlisted, the State must within 30 days of receiving notice of the federal permit appli-

cation inform the federal agency and federal permit applicant that the proposed activity requires CZMA consistency review. § 930.54. If the State does not provide timely notification, it waives the right to review the unlisted activity. In the present case, it appears that Granite Rock's proposed mining operations were not listed pursuant to § 930.53, and that the Coastal Commission did not timely notify the Forest Service or Granite Rock that Granite Rock's plan of operations required consistency review. App. 17. Therefore, the Coastal Commission waived its right to consistency review of the 1981–1986 plan of operations.

Absent any other expression of congressional intent regarding the pre-emptive effect of the CZMA, we would be required to decide, first, whether unpatented mining claims in national forests were meant to be excluded from the § 1453(1) definition of a State's coastal zone, and, second, whether this exclusion from the coastal zone definition was intended to pre-empt state regulations that were not pre-empted by any other federal statutes or regulations. Congress has provided several clear statements of its intent regarding the pre-emptive effect of the CZMA; those statements, which indicate that Congress clearly intended the CZMA *not* to be an independent cause of pre-emption except in cases of actual conflict, end our inquiry.

Title 16 U. S. C. § 1456(e)(1) provides:

> "Nothing in this chapter shall be construed —
>    "(1) to diminish either Federal or state jurisdiction, responsibility, or rights in the field of planning, development, or control of water resources, submerged lands, or navigable waters; nor to displace, supersede, limit, or modify any interstate compact or the jurisdiction or responsibility of any legally established joint or common agency of two or more states or of two or more states and the Federal Government; nor to limit the authority of Congress to authorize and fund projects. . . ."

The Senate Report describes the above section as "a standard clause disclaiming intent to diminish Federal or State authority in the fields affected by the Act," or "to change interstate agreements." S. Rep. No. 92–753, p. 20 (1972). The Conference Report stated, "[t]he Conferees also adopted language which would make certain that there is no intent in this legislation to change Federal or state jurisdiction or rights in specified fields, including submerged lands." H. R. Conf. Rep. No. 92–1544, p. 14 (1972). While the land at issue here does not appear to fall under the categories listed in 16 U. S. C. § 1456(e)(1), the section and its legislative history demonstrate Congress' refusal to use the CZMA to alter the balance between state and federal jurisdiction.

The clearest statement of congressional intent as to the pre-emptive effect of the CZMA appears in the "Purpose" section of the Senate Report, quoted in full:

> "[The CZMA] has as its main purpose the encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States. The bill authorizes Federal grants-in-aid to coastal states to develop coastal zone management programs. Additionally, it authorizes grants to help coastal states implement these management programs once approved, and States would be aided in the acquisition and operation of estuarine sanctuaries. Through the system of providing grants-in-aid, the States are provided financial incentives to undertake the responsibility for setting up management programs in the coastal zone. *There is no attempt to diminish state authority through federal preemption.* The intent of this legislation is to enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zones." S. Rep. No. 92–753, *supra,* at 1 (emphasis supplied).

Because Congress specifically disclaimed any intention to pre-empt pre-existing state authority in the CZMA, we conclude that even if all federal lands are excluded from the CZMA definition of "coastal zone," the CZMA does not automatically pre-empt all state regulation of activities on federal lands.

## IV

Granite Rock's challenge to the California Coastal Commission's permit requirement was broad and absolute; our rejection of that challenge is correspondingly narrow. Granite Rock argued that any state permit requirement, whatever its conditions, was *per se* pre-empted by federal law. To defeat Granite Rock's facial challenge, the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law. The Coastal Commission alleges that it will use its permit requirement to impose reasonable environmental regulation. Rather than evidencing an intent to pre-empt such state regulation, the Forest Service regulations appear to assume compliance with state laws. Federal land use statutes and regulations, while arguably expressing an intent to pre-empt state land use planning, distinguish environmental regulation from land use planning. Finally, the language and legislative history of the CZMA expressly disclaim an intent to pre-empt state regulation.

Following an examination of the "almost impenetrable maze of arguably relevant legislation," *post*, at 606, JUSTICE POWELL concludes that "[i]n view of the Property Clause . . . , as well as common sense, federal authority must control . . . ." *Ibid.* As noted above, the Property Clause gives Congress plenary power over the federal land at issue; however, even within the sphere of the Property Clause, state law is pre-empted only when it conflicts with the operation or objectives of federal law, or when Congress "evidences an intent to occupy a given field," *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S., at 248. The suggestion that traditional pre-emption analysis is inapt in this context can be

justified, if at all, only by the assertion that the state regulation in this case would be "duplicative." The description of the regulation as duplicative, of course, is based on JUSTICE POWELL's conclusions that land use regulation and environmental regulation are indistinguishable, *post*, at 600–601, and that any state permit requirement, by virtue of being a permit requirement rather than some other form of regulation, would duplicate federal permit requirements, *post*, at 604–605. Because we disagree with these assertions, see *supra*, at 587–588, 589, we apply the traditional pre-emption analysis which requires an actual conflict between state and federal law, or a congressional expression of intent to pre-empt, before we will conclude that state regulation is pre-empted.

Contrary to the assertion of JUSTICE POWELL that the Court today gives States power to impose regulations that "conflict with the views of the Forest Service," *post*, at 606, we hold only that the barren record of this facial challenge has not demonstrated any conflict. We do not, of course, approve any future application of the Coastal Commission permit requirement that in fact conflicts with federal law. Neither do we take the course of condemning the permit requirement on the basis of as yet unidentifiable conflicts with the federal scheme.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

Because I agree that this case is properly before us, I join Parts I and II of the Court's opinion. In Part III, the Court considers the Forest Service's approval of Granite Rock's plan to operate its mine in a national forest. Because I cannot agree with the Court's conclusion that Congress intended to allow California to require a state permit, I dissent from Part III.

I

A

To understand Part III of the Court's opinion, one must have some knowledge of two groups of statutes and regulations. The first group of provisions regulates mining. As the Court explains, the basic source of federal mining law is the Mining Act of 1872, ch. 152, 17 Stat. 91, as amended, 30 U. S. C. § 22 *et seq.* In general, that law opens the public lands to exploration. If one discovers valuable mineral deposits, the statute grants him the right to extract and sell the minerals without paying a royalty to the United States, as well as the right—subject to certain statutory requirements— to obtain fee title to the land. See Mining Act § 1, 30 U. S. C. § 22; *United States* v. *Locke,* 471 U. S. 84, 86 (1985). As the demand for minerals has increased during the past century, Congress has emphasized that an "economically sound and stable domestic mining . . . industr[y]" is important to the economy, and to our Nation's security. See Mining and Minerals Policy Act of 1970, § 2, 30 U. S. C. § 21a.[1]

B

The second area of federal law important to this case concerns the management of federal lands. In response to the increasing commercial importance of federal lands, as well as the awareness of the environmental values of these lands,

---

[1] See also National Materials and Minerals Policy, Research and Development Act of 1980, § 2(a)(1), 30 U. S. C. § 1601(a)(1) (congressional finding that the availability of minerals "is essential for national security, economic well-being, and industrial production"); § 2(a)(3), 30 U. S. C. § 1601(a)(3) (congressional finding that the extraction of minerals is "closely linked with national concerns for energy and the environment"); § 3, 30 U. S. C. § 1602 ("[I]t is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production with appropriate attention to a long-term balance between resource production, energy use, a healthy environment, natural resources conservation, and social needs").

Congress passed the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U. S. C. § 1701 *et seq.* (1982 ed. and Supp. III). That statute promotes the effective development of federal lands in two ways pertinent to this case. First, it directs the Secretary of the Interior to inventory the resources located on federal lands and to develop comprehensive plans for future development. §§ 1701(a)(2), 1711, 1712. Second, it ensures that the States' interests in these resources will not be ignored:

> "[T]he Secretary shall . . . coordinate [his plans] with the land use planning and management programs of . . . the States and local governments within which the lands are located. . . . Land use plans of the Secretary . . . shall be consistent with State and local plans to the maximum extent he finds consistent with Federal law and the purposes of this Act." § 1712(c)(9).

Significantly, the FLPMA only requires the Secretary to listen to the States, not obey them. As the Conference Report explained: "[T]he ultimate decision as to determining the extent of feasible consistency between [the Secretary's] plans and [state or local] plans rests with the Secretary of the Interior." H. R. Conf. Rep. No. 94–1724, p. 58 (1976).

The surface management provisions of the FLPMA do not apply to national forest lands. 43 CFR § 3809.0–5(c) (1986). Congress first provided for management of these lands in the Organic Administration Act of 1897. The current version of that statute delegates to the Secretary of Agriculture the authority to "regulate [the] occupancy and use" of national forests. 16 U. S. C. § 551. The Forest Service, as the Secretary's delegate, has promulgated regulations to control the "use" of national forests. 36 CFR § 228.1 *et seq.* (1986). Persons wishing to mine in the national forests submit plans of operation detailing their anticipated activities. If the For-

est Service determines that the plans comply with the regulations, it approves them and authorizes the mining operation. The Court, by focusing on the Forest Service's concern for preservation of the national forests, characterizes these regulations as "environmental" regulations, in its view something entirely different from "land use" regulations. *Ante*, at 587–589.

In fact, the regulation of land use is more complicated than the Court suggests. First, as is true with respect to the Secretary of the Interior, the Secretary of Agriculture has been directed to develop comprehensive plans for the use of resources located in national forests. See Forest and Rangeland Renewable Resources Planning Act of 1974 (Forest Planning Act) § 3(a), as amended, 16 U. S. C. § 1601. The Forest Planning Act initially did not require the Forest Service to consider the views of state regulators. But when Congress passed the FLPMA in 1976, it also passed the National Forest Management Act (NFMA), that amended the Forest Planning Act. Of special importance, § 6(a) of the NFMA requires the Secretary of Agriculture to coordinate his land management plans "with the land and resource management planning processes of State and local governments." 16 U. S. C. § 1604(a). Section 14 specifically requires the Secretary of Agriculture to give state governments "adequate notice and an opportunity to comment upon the formulation of standards, criteria, and guidelines applicable to Forest Service programs." § 1612(a). Thus, it is clear that the Secretary of Agriculture has the final authority to determine the best use for federal lands, and that he must consider the views of state regulators before making a decision. There is no suggestion in the statute or the legislative history that state regulators should have the final authority in determining how particular federal lands should be used.

The Forest Service also has a role in implementing the Nation's mineral development policy. The Court shrugs off the

importance of this obligation, noting that " 'the responsibility for managing [mineral] resources is in the Secretary of the Interior.' "   *Ante,* at 588 (quoting 36 CFR § 228.1 (1986)). This statement erroneously equates mineral resources management with land use management.   Title 43 of the Code of Federal Regulations details the activities of the Bureau of Land Management (BLM) in this context.   Generally, BLM manages the process by which rights to minerals are obtained from the United States and protected against others, the payment of royalties to the Federal Government, and the conservation of the minerals themselves.   In some cases— like those of oil, gas, and coal—BLM supervises leasing of the right to extract the materials.   But this case involves "hardrock" minerals governed by the Mining Act of 1872.   With respect to those minerals, BLM's actions are limited to determining whether the land is subject to location under the mining laws; whether a mining claim is properly located and recorded; whether assessment work is properly performed; and whether the requirements for patenting a claim have been complied with.   See 43 CFR pts. 3800–3870 (1986).   None of these determinations is a "land use" determination in the sense of balancing mineral development against environmental hazard to surface resources.   The Forest Service makes these determinations through its review of a mining plan of operation.

The Organic Administration Act of 1897 makes clear that the Forest Service must act consistently with the federal policy of promoting mineral development.   Section 1 of that Act precludes the Secretary of Agriculture from taking any action that would "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof."   16 U. S. C. § 478.[2]   Forest Service ma-

---

[2] More recently, congressional solicitude for development of federal mineral resources led Congress to order the President to "coordinate the responsible departments and agencies to, among other measures . . . en-

terials confirm its duty to balance "[t]he demand for mineral development . . . against the demand for renewable resources and the land management agency's responsibility to reasonably protect the environment." United States Dept. of Agriculture, Forest Service Minerals Program Handbook preface (1983). See also Forest Service Manual § 2802 (Dec. 1986) (stating that the Forest Service's policy is to "ensure that exploration, development, and production of mineral and energy resources are conducted in an environmentally sound manner and that these activities are integrated with planning and management of other national forest resources"); 30 U. S. C. § 1602. In sum, although the Secretary of the Interior has a substantial responsibility for managing mineral resources, Congress has entrusted the task of balancing mineral development and environmental protection in the national forests to the Department of Agriculture, and its delegate the Forest Service.

## II

The Court's analysis of this case focuses on selected provisions of the federal statutes and regulations, to the exclusion of other relevant provisions and the larger regulatory context. First, it examines the Forest Service regulations themselves, apart from the statutes that authorize them. Because these regulations explicitly require the federal permits to comply with specified state environmental standards, the Court assumes that Congress intended to allow state enforcement of any and all state environmental standards. Careful comparison of the regulations with the authorizing statutes casts serious doubt on this conclusion. The regulations specifically require compliance with only three types of state regulation: air quality, see 36 CFR § 228.8(a) (1986); water quality, see § 228.8(b); and solid waste disposal, see § 228.8(c). But the Court fails to mention that the types of

---

courage Federal agencies to facilitate availability and development of domestic resources to meet critical materials needs." 30 U. S. C. § 1602(7).

state regulation preserved by §228.8 already are preserved by specific nonpre-emption clauses in other federal statutes. See 42 U. S. C. §7418(a) (Clean Air Act requires federal agencies to comply with analogous state regulations); 33 U. S. C. §1323(a) (similar provision of the Clean Water Act); 42 U. S. C. §6961 (similar provision of the Solid Waste Disposal Act). The Forest Service's specific preservation of certain types of state regulation—already preserved by federal law—hardly suggests an implicit intent to allow the States to apply other types of regulation to activities on federal lands. Indeed the maxim *expressio unius est exclusio alterius* suggests the contrary.[3]

The second part of the Court's analysis considers both the NFMA and the FLPMA. The Court assumes, *ante*, at 585, that these statutes "pre-emp[t] the extension of state land use plans onto unpatented mining claims in national forest lands." But the Court nevertheless holds that the Coastal Commission can require Granite Rock to secure a state permit before conducting mining operations in a national forest. This conclusion rests on a distinction between "land use plan-

---

[3] The Court rests this part of its pre-emption analysis on *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707 (1985). In that case, the Court stated: "[W]e will pause before saying that the mere volume and complexity of [an agency's] regulations indicate that the agency did in fact intend to pre-empt." *Id.*, at 718. *Hillsborough,* however, is quite different from this case. First, the state regulations were designed to ensure the health of plasma donors, an aim entirely separate from the aim of the federal regulations, to ensure the purity of the donated plasma. In this case, by contrast, federal authorities already have considered the environmental effects of Granite Rock's mine. The California Coastal Commission seeks only to reconsider the decision of the federal authorities. In any event, the argument for pre-emption in this case does not rest on the Forest Service regulations alone, but also on the comprehensive regulatory system enacted by Congress. The Court cannot make *Hillsborough* controlling simply by considering the regulations separately from their statutory source. As I explain, *infra*, at 604–606, the complex of applicable statutes and regulations, considered as a whole, pre-empts the Coastal Commission's permit requirement.

ning" and "environmental regulation." In the Court's view, the NFMA and the FLPMA indicate a congressional intent to pre-empt state land use regulations, but not state environmental regulations. I find this analysis unsupportable, either as an interpretation of the governing statutes or as a matter of logic.

The basis for the alleged distinction is that Congress has understood land use planning and environmental regulation to be distinct activities. The only statute cited for this proposition is § 202(c)(8) of the FLPMA, 43 U. S. C. § 1712(c)(8), that requires the Secretary of the Interior's land use plans to "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." But this statute provides little support for the majority's analysis. A section mandating consideration of environmental standards in the formulation of land use plans does not demonstrate a general separation between "land use planning" and "environmental regulation." Rather, § 202(c)(8) recognizes that the Secretary's land use planning will affect the environment, and thus directs the Secretary to comply with certain pollution standards.

Nor does this section support the Court's ultimate conclusion, that Congress intended the Secretary's plans to comply with all state environmental regulations. As I have explained *supra*, at 599–600, other federal statutes require compliance with the listed standards.[4] Also, because the

---

[4] The Forest Service regulations discussed above mention a slightly different set of environmental standards than does the FLPMA. Both provisions specifically preserve air and water standards. The Forest Service regulations also mention solid waste disposal standards; the Land Management Act also mentions noise control standards. Cf. 42 U. S. C. § 4901(a)(3) (Noise Control Act provision stating that the "primary responsibility for control of noise rests with State and local governments"). The slight difference between the two lists of pollution standards, however, is insignificant. The feature that *all* the listed standards have in common is

FLPMA requires compliance only with "applicable" standards, it is difficult to treat this one section as an independent and controlling command that the Secretary comply with all state environmental standards. Rather, viewing the complex of statutes and regulations as a whole, it is reasonable to view § 202(c)(8) simply as a recognition that the Secretary's plans must comply with standards made applicable to federal activities by other federal laws.

The only other authority cited by the Court for the distinction between environmental regulation and land use planning is a Forest Service regulation stating that the Forest Service's rules do not "provide for the management of mineral resources," 36 CFR § 228.1 (1986). From this, the Court concludes that the Forest Service enforces environmental regulation but does not engage in land use planning. This conclusion misunderstands the division of authority between the BLM and the Forest Service. As explained *supra*, at 597–598, the BLM's management of minerals does not entail management of surface resources or the evaluation of surface impacts. Indeed, the Court acknowledges that the Forest Service is "responsible for the management of the surface impacts of mining on federal forest lands." *Ante*, at 585. The Forest Planning Act and the NFMA direct the Secretary of Agriculture and the Forest Service to develop comprehensive plans for the use of forest resources. Similarly, the Organic Administration Act commands the Secretary of Agriculture to promulgate regulations governing the "occupancy and use" of national forests, 16 U. S. C. § 551. These regulations are integral to the Forest Service's management of national forests. To view them as limited to environmental concerns ignores both the Forest Service's broader responsibility to manage the use of forest resources and the federal policy of making mineral resources accessible to

that other federal statutes specifically preserve a place for state regulation. See *supra*, at 599–600.

development.[5]   The Coastal Commission has no interest in
the matters within the jurisdiction of the BLM; the regula-
tions that it seeks to impose concern matters wholly within
the control of the Forest Service.   Thus, this regulation does
not support the Court's distinction between environmental
regulation and land use planning.

The most troubling feature of the Court's analysis is that it
is divorced from the realities of its holding.   The Court cau-
tions that its decision allows only "reasonable" environmental
regulation and that it does not give the Coastal Commission
a veto over Granite Rock's mining activities.   But if the
Coastal Commission can require Granite Rock to secure a
permit before allowing mining operations to proceed, it nec-
essarily can forbid Granite Rock from conducting these oper-
ations.   It may be that reasonable environmental regulations
would not force Granite Rock to close its mine.   This misses
the point.   The troubling fact is that the Court has given a
state authority—here the Coastal Commission—the power to
prohibit Granite Rock from exercising the rights granted by

---

[5] The lack of statutory support for the Court's distinction is not surpris-
ing, because—with all respect—it seems to me that the distinction is one
without a rational difference.   As the Court puts it: "Land use planning in
essence chooses particular uses for the land; environmental regulation, at
its core, does not mandate particular uses of the land but requires only
that, however the land is used, damage to the environment is kept within
prescribed limits."   *Ante*, at 587.   This explanation separates one of the
reasons for Forest Service decisions from the decisions themselves.   In
considering a proposed use of a parcel of land in the national forest, the
Forest Service regulations consider the damage the use will cause to the
environment as well as the federal interest in making resources on public
lands accessible to development.   The Forest Service may decide that the
proposed use is appropriate, that it is inappropriate, or that it would be
appropriate only if further steps are taken to protect the environment.
The Court divides this decision into two distinct types of regulation and
holds that Congress intended to pre-empt duplicative state regulation of
one part but not the other.   Common sense suggests that it would be best
for one expert federal agency, the Forest Service, to consider all these
factors and decide what use best furthers the relevant federal policies.

its Forest Service permit. This abdication of federal control over the use of federal land is unprecedented.[6]

## III

Apart from my disagreement with the Court's characterization of the governing statutes, its pre-emption analysis accords little or no weight to both the location of the mine in a national forest, and the comprehensive nature of the federal statutes that authorized Granite Rock's federal permit.

One important factor in pre-emption analysis is the relative weight of the state and federal interests in regulating a particular matter. Cf. *Hines* v. *Davidowitz*, 312 U. S. 52, 66–69 (1941). The Court recognizes that the mine in this case is located in a national forest, but curiously attaches no significance to that fact. The Property Clause specifically grants Congress "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U. S. Const., Art. IV, § 3, cl. 2. See *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 404 (1917). This provision may not of its own force pre-empt the authority of a State to regulate activities on federal land, but it clearly empowers Congress to limit the extent to which a State may regulate in this area. In light of this clear constitutional allocation of power, the location of the mine in a national forest should make us less reluctant to find pre-emption than we are in other contexts.

The state regulation in this case is particularly intrusive because it takes the form of a separate, and duplicative, permit system. As the Court has recognized, state permit requirements are especially likely to intrude on parallel federal authority, because they effectively give the State the power to veto the federal project. See *International Paper Co.* v.

---

[6] I express no view as to the Court's conclusion that the Coastal Zone Management Act of 1972 (CZMA), 16 U. S. C. § 1451 *et seq.* (1982 ed. and Supp. III), does not pre-empt the state regulation in this case. See *ante,* at 589–593.

*Ouellette,* 479 U. S. 481, 495 (1987); *First Iowa Hydro-Electric Cooperative* v. *FPC,* 328 U. S. 152, 164 (1946). Although the intrusive effect of duplicative state permit systems may not lead to a finding of pre-emption in all cases, it certainly is relevant to a careful pre-emption analysis.

The dangers of duplicative permit requirements are evident in this case. The federal permit system reflects a careful balance between two important federal interests: the interest in developing mineral resources on federal land, and the interest in protecting our national forests from environmental harm. The Forest Service's issuance of a permit to Granite Rock reflects its conclusion that environmental concerns associated with Granite Rock's mine do not justify restricting mineral development on this portion of a federal forest. Allowing the Coastal Commission to strike a different balance necessarily conflicts with the federal system.

Furthermore, as discussed *supra,* at 595–597, Congress already has provided that affected States must be afforded an opportunity to communicate their concerns to the federal regulators charged with deciding how federal lands should be used.[7] Because Congress has ensured that any federal de-

---

[7] The discussion in Part I deals primarily with the FLPMA and the NFMA. In this case, the Coastal Commission actually had yet another statutory basis for influencing the federal decisionmaking process. Because Granite Rock's mine is near the California Coast, the Coastal Commission has a right to consistency review under the CZMA. Thus, if the Coastal Commission had voiced its concerns, the Secretary could not have approved this permit unless he determined, after a hearing, that "the activity is consistent with the objectives of [the CZMA] or is otherwise necessary in the interest of national security." 16 U. S. C. § 1456(c)(3)(A). Although the Coastal Commission had notice of Granite Rock's application to the Forest Service, it did not object to Granite Rock's activities until two years after the application was approved and Granite Rock began mining pursuant to the federal permit. Because the Coastal Commission failed to make a timely complaint to the Forest Service, it forfeited its right to consistency review under the CZMA.

By noting the provision for consistency review, I do not imply that the CZMA itself pre-empts the Coastal Commission's permit requirement. See

cision will reflect the environmental concerns of affected States, a duplicative system of permits would serve no purpose. Indeed, the potential for conflict between state and federal decisions has obvious disadvantages.

## IV

In summary, it is fair to say that, commencing in 1872, Congress has created an almost impenetrable maze of arguably relevant legislation in no less than a half-dozen statutes, augmented by the regulations of two Departments of the Executive. There is little cause for wonder that the language of these statutes and regulations has generated considerable confusion. There is an evident need for Congress to enact a single, comprehensive statute for the regulation of federal lands.

Having said this, it is at least clear that duplicative federal and state permit requirements create an intolerable conflict in decisionmaking.[8] In view of the Property Clause of the Constitution, as well as common sense, federal authority must control with respect to land "belonging to the United States." Yet, the Court's opinion today approves a system of twofold authority with respect to environmental matters. The result of this holding is that state regulators, whose views on environmental and mineral policy may conflict with the views of the Forest Service, have the power, with respect to federal lands, to forbid activity expressly authorized by the Forest Service. I dissent.

n. 6, *supra.* I believe, however, that the provision for consistency review, considered with the other specific provisions for state participation in the federal regulatory process, indicates that Congress did not believe the States could have imposed separate permit requirements, even before passage of the CZMA.

[8] The Court concludes that Granite Rock has failed to demonstrate a conflict because it rejects my conclusion that land use regulation and environmental regulation are indistinguishable and because it sees no harm in allowing state permit requirements to supersede the decisions of federal officials. *Ante,* at 593–594.

JUSTICE SCALIA, with whom JUSTICE WHITE joins, dissenting.

I agree with the Court that this case is live because of continuing dispute over California's ability to assert a reclamation claim, *ante*, at 578.[1] In my view, however, the merits of this case must be decided on simpler and narrower grounds than those addressed by the Court's opinion. It seems to me ultimately irrelevant whether state environmental regulation has been pre-empted with respect to federal lands, since the exercise of state power at issue here is not environmental regulation but land use control. The Court errs in entertaining the Coastal Commission's contention that "its permit requirement is an exercise of environmental regulation," *ante*, at 589; and mischaracterizes the issue when it describes it to be whether "any state permit requirement, whatever its conditions, [is] *per se* pre-empted by federal law," *ante*, at 593. We need not speculate as to what the nature of this permit requirement was. We are not dealing with permits in the abstract, but with a specific permit, purporting to require application of particular criteria, mandated by a numbered section of a known California law. That law is plainly a land use statute, and the permit that statute requires Granite Rock to obtain is a land use control device. Its character

---

[1] I would not rely upon the alternative ground that the dispute between these parties is "capable of repetition yet evading review." *Ante*, at 578. Assuming that Granite Rock submits a new 5-year plan to the Forest Service and that California again seeks to require it to comply with the coastal permitting requirements, I see no reason why that action would evade our review. See *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975). Moreover, for a dispute to be "capable of repetition," there must be a "reasonable expectation that the same complaining party [will] be subjected to the same action again." *Ibid.* The Court may be correct that it is *possible* that California will seek to enforce its permit requirement directly again, *ante*, at 578; but since California may well be able to accomplish what it wants through the Coastal Zone Management Act's consistency review procedures, 16 U. S. C. § 1456(c)(3)(A), I do not think it likely that it will do so.

as such is not altered by the fact that the State may now be agreeable to issuing it so long as environmental concerns are satisfied. Since, as the Court's opinion quite correctly assumes, *ante*, at 585, state exercise of land use authority over federal lands is pre-empted by federal law, California's permit requirement must be invalid.

The permit at issue here is a "coastal development permit," required by the California Coastal Act, Cal. Pub. Res. Code Ann. § 30000 *et seq.* (West 1986). It is provided for by § 30600 of Chapter 7 of that Act (entitled "Development Controls"), which states that a person wishing to undertake any "development" in the coastal zone—a term defined to include construction, mining, and "change in the density or intensity of use of land," § 30106—must obtain a coastal development permit from a local government or the California Coastal Commission. The permit is to be granted if the proposed development is in conformity with a state-approved local coastal program or, where no such program yet exists, if the proposed development "is in conformity with the provisions of Chapter 3 . . . and . . . will not prejudice the ability of the local government to prepare a local coastal program that is in conformity with Chapter 3." § 30604. The "local coastal programs" to which these provisions refer consist of two parts: (1) a land use plan, and (2) zoning ordinances, zoning maps, and other implementing actions. §§ 30511(b), 30512, 30513. Chapter 3 of the Act, with which these local coastal programs must comply, consists largely of land use prescriptions—for example, that developments providing public recreational opportunities shall be preferred, § 30213; that oceanfront land suitable for recreational use shall be protected for recreational use and development, § 30221; that commercial recreational facilities shall have priority over private residential, general industrial, or general commercial development, but not over agriculture or coastal-dependent industry, § 30222; that oceanfront land suitable for coastal-dependent aquaculture shall be protected for that use,

§ 30222.5; that facilities serving the commercial fishing and recreational boating industries shall be protected and, where feasible, upgraded, § 30234; that the maximum amount of prime agricultural land shall be maintained in agricultural production, § 30241; that all other lands suitable for agricultural use shall not be converted to nonagricultural use except in specified circumstances, § 30242; that conversions of coastal commercial timberlands in units of commercial size to other uses shall be limited to providing for necessary timber processing and related facilities, § 30243; that the location and amount of new development should maintain and enhance public access to the coast, § 30252; that coastal-dependent developments shall have priority over other developments on or near the shoreline, § 30255; and that coastal-dependent industrial facilities shall be encouraged to locate or expand within existing sites, § 30260.[2]

---

[2] The State Coastal Commission is responsible for issuing coastal development permits until the Commission has certified a local land use plan, Cal. Pub. Res. Code Ann. § 30600.5(b) (West 1986), at which time the responsibility devolves upon the local government, *ibid.* Regardless of which governmental entity has the authority to issue the permit, the requirements for its issuance are those set forth in Chapter 3 of the California Coastal Act discussed *supra.* These apply directly if a local coastal program has not been certified, § 30604(a), or by enforcement of the requirements of the local coastal program, § 30604(b), whose land use plan must conform with that Chapter in order to be certified, §§ 30512(c), 30512.1(c), 30512.2. Because local coastal programs consist of such classic land use regulation tools as a land use plan, zoning maps, zoning ordinances, and other implementing devices, §§ 30511(b), 30512, permits issued upon a showing of consistency with a local coastal program may be even more obviously land use control devices than permits issued upon a showing of consistency with the provisions of Chapter 3. But under the plain terms of the statute, the latter no less than the former are permits for land use. To establish the contrary proposition, which is essential to its holding, the majority relies upon nothing more substantial than the statement of counsel for the Commission, in oral argument before us, that "[T]he Coastal Commission issues permits based upon compliance with the environmental criteria in the Coastal Act itself." Tr. of Oral Arg. 52, quoted *ante,* at 586, n. 2. Read literally (*i. e.,* without inferring the adverb

It could hardly be clearer that the California Coastal Act is land use regulation. To compound the certainty, California has designated its Coastal Act as the State's coastal management program for purposes of the Coastal Zone Management Act (CZMA), 16 U. S. C. § 1451 *et seq.* Cal. Pub. Res. Code Ann. § 30008 (West 1986). The requirements for such a program include "[a] definition of what shall constitute permissible land uses and water uses within the coastal zone," 16 U. S. C. § 1454(b)(2), and "[a]n identification of the means by which the state proposes to exert control over [those] land uses and water uses." § 1454(b)(4).

The § 30600 permit requirement, of course, is one of those means of control—and whenever a permit application is evaluated pursuant to the statutory standards, land (or water) use management is afoot. Even if, as the State has argued before us and as the Court has been willing to postulate, California intended to employ the land use permit in this case only as a device for exacting environmental assurances, the power to demand *that permit* nevertheless hinges upon the State's power to do what the statutory permitting requirements authorize: to control land use. The legal status of the matter is that Granite Rock, having received land use approval from the Federal Government, has been requested to obtain land use approval from the State of California. If state land use regulation is in fact pre-empted in this location, there is no justification for requiring Granite Rock to go through the motions of complying with that ultra vires request on the chance that permission will be granted with no more than environmental limitations. It is inconceivable

---

"exclusively"), the statement is true (the Act does contain some environmental criteria) but unhelpful to the majority's case. If, however, counsel meant to imply that the Commission's permits could not be conditioned upon compliance with the land use criteria, the statement would not only contradict the plain language of the Act, but would also be inconsistent with the litigating position taken by the Commission in the previous stages of this lawsuit, see *infra,* at 611–612.

that, if a labor union federally certified as an authorized bargaining agent sought injunctive or declaratory relief against a requirement that it submit to state certification for the same purpose, we would say that "[b]y choosing to seek . . . relief against the . . . requirement before discovering what conditions the [State] would have placed on the [certification], [the union] has lost the possibility" of prevailing. *Ante,* at 588. I see no basis for making the equivalent statement here. In the one case as in the other, the demand for state approval is in and of itself invalid. As the Ninth Circuit said in a similar case that we summarily affirmed:

> "The issue is whether [the State] has the power of ultimate control over the Government's lessee, and this issue persists whether or not a use permit would eventually be granted." *Ventura County* v. *Gulf Oil Corp.*, 601 F. 2d 1080, 1085 (1979), summarily aff'd, 445 U. S. 947 (1980).

Even on the assumption, therefore, that California was only using its land use permit requirement as a means of enforcing its environmental laws, Granite Rock was within its rights to ignore that requirement—*unless* California has land use authority over the federal lands in question.

In fact, however, this case is even more straightforward than that, for there is no reason to believe that California was seeking anything less than what the Coastal Act requires: land use regulation. The Commission's letter to Granite Rock demanding a permit application read as follows:

> "Because of the significant control and authority enjoyed by Granite Rock Company over the land subject to its mining claims at Pico Blanco and the concommitant *[sic]* significant diminution of federal discretionary control, this land cannot be included among the federal lands excluded from the coastal zone by the CZMA. . . . Consequently, because the land is located seaward of the coastal zone boundary established by the state legisla-

ture effective January 1, 1977, it is subject to the permit requirements of the California Coastal Act.

"This letter will serve to notify Granite Rock of its obligation to apply to the Coastal Commission for a coastal development permit for any development, as defined in Section 30106 of the Coastal Act, at the site undertaken after the date of this letter." App. 22.

This letter contains no hint that only environmental constraints are at issue, as opposed to compliance with all of the requirements of the State's coastal management program. Even in the litigation stage—both in the District Court and in the Court of Appeals—the argument that California was (or might be) seeking to enforce only environmental controls was merely an alternative position. The Commission's more sweeping contention was that the land in question is not excluded from the CZMA, and that the CZMA permits designated state coastal management programs to override the Mining Act. See App. to Juris. Statement A–4, A–12, A–24. That argument has not been pressed here, having been rejected by both lower courts. 768 F. 2d 1077, 1080–1081 (CA9 1985); 590 F. Supp. 1361, 1370–1371 (ND Cal. 1984). It is perfectly clear, however, that the assertion that the State is only enforcing its environmental laws is purely a litigating position—and a late-asserted one at that.

On any analysis, therefore, the validity of California's demand for permit application, and the lawfulness of Granite Rock's refusal, depend entirely upon whether California has authority to regulate land use at Pico Blanco. The Court is willing to assume that California lacks such authority on account of the National Forest Management Act of 1976 (NFMA), 16 U. S. C. § 1600 *et seq.* (1982 ed. and Supp. III), and the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U. S. C. § 1701 *et seq.* (1982 ed. and Supp. III). *Ante,* at 585. I believe that assumption is correct. Those statutes, as well as the CZMA, require federal officials to coordinate and consult with the States regarding use of fed-

eral lands in order to assure consistency with state land use plans to the maximum extent compatible with federal law and objectives. 16 U. S. C. §§ 1456(c)(3)(A), 1604(a); 43 U. S. C. § 1712(c). Those requirements would be superfluous, and the limitation upon federal accommodation meaningless, if the States were meant to have independent land use authority over federal lands. The Court is quite correct that the CZMA did not purport to change the status quo with regard to state authority over the use of federal lands. *Ante,* at 589–593. But as the CZMA's federal lands exclusion, 16 U. S. C. § 1453(1), and consistency review provisions, 16 U. S. C. § 1456(c)(3)(A), clearly demonstrate, that status quo was assumed to be exclusive federal regulation.

Finally, any lingering doubt that exercise of Coastal Act authority over federal lands is an exercise of land use authority pre-empted by federal laws is removed by the fact that that is not only the view of the federal agencies in charge of administering those laws, see Brief for United States as *Amicus Curiae,* but also was the original view of California, which until 1978 excluded from the Coastal Act, in language exactly mirroring that of the federal lands exclusion from the CZMA, 16 U. S. C. § 1453(1), "lands the use of which is by law subject solely to the discretion of or which is held in trust by the federal government, its officers or agents." 1976 Cal. Stats., ch. 1331, § 1, as amended by 1978 Cal. Stats., ch. 1075, § 2, codified at Cal. Pub. Res. Code Ann. § 30008 (West 1986).

Any competent lawyer, faced with a demand from the California Coastal Commission that Granite Rock obtain a § 30600 coastal development permit for its Pico Blanco operations, would have responded precisely as Granite Rock's lawyers essentially did: Our use of federal land has been approved by the Federal Government, thank you, and does not require the approval of the State. We should not allow California to claim, in the teeth of the plain language of its legislation, and in violation of the assurance it gave to the Federal Gov-

ernment by designating its Coastal Act as a coastal management program under the CZMA, that it would use the permitting requirement to achieve, not land use management, but only environmental controls. We should particularly not give ear to that claim since it was not the representation made to Granite Rock when application for the permit was demanded. If environmental control is, as California now assures us, its limited objective in this case, then it must simply achieve that objective by means other than a land use control scheme. If and when it does so, we may have occasion to decide (as we need not today) whether state environmental controls are also pre-empted. More likely, however, the question will not arise in the future, as it has not arisen in the past, because of the Federal Government's voluntary accommodation of state environmental concerns—an accommodation that could not occur here only because California neglected to participate in the proceedings. *Ante*, at 576–577, n. 1, 591.

I would affirm the court below on the ground that the California Coastal Act permit requirement constitutes a regulation of the use of federal land and is therefore pre-empted by federal law.