Filed 9/23/14 Certified for publication 10/8/14 (order attached)

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| THE PEOPLE, | C074662 |
| Plaintiff and Respondent, | (Super. Ct. No. M1200659) |
| v. | |
| BRANDON LANCE RINEHART, | |
| Defendant and Appellant. | |

In this case, we are asked to consider whether provisions of California Fish and Game Code sections 5653 and 5653.1 (unless otherwise stated, statutory references that follow are to the Fish and Game Code), as applied, are preempted by federal law because they "stand[] as an obstacle to the accomplishment [and execution] of the full purposes and objectives of Congress." (*California Coastal Commission et al. v. Granite Rock Co.* (1987) 480 U.S. 572, 581 [94 L.Ed.2d 577, 592] (*Granite Rock*); *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936 (*Viva!*).) On this record, we are unable to make that determination and we remand the matter to the trial court for further proceedings on the issue of federal preemption.

1

On August 30, 2012, the District Attorney of Plumas County filed a criminal complaint charging defendant with a violation of section 5653, subdivision (a) in that he used vacuum and suction dredge equipment in a river, stream, or lake without a permit (Count I) and with a violation of section 5653, subdivision (d) in that he possessed a vacuum and suction dredge within an area closed to the use of that equipment and within 100 yards of waters closed to the use of that equipment (Count II).

On October 30, 2012, defendant demurred to the complaint arguing that, in light of section 5653.1 as amended, the state has "indefinitely suspended the issuance of all permits for suction dredging, closing all waters of the state to" that use. On December 18, 2012, the trial court overruled the demurrer.

On May 15, 2013, defendant waived his right to a jury and agreed to a court trial regarding the violations with which he was charged. The parties stipulated to the following facts:

"1.     On or about June 16, 2012 Defendant Brandon L. Rinehart did use vacuum and suction dredge equipment in the County of Plumas in a river or stream in the Plumas National Forest in an area closed to suction dredge mining by the State of California, and did not then possess a valid permit issued by the California Department of Fish and Wildlife, then known as the Department of Fish and Game, to use his vacuum and suction dredge equipment.

"2.     On or about June 16, 2012 Defendant Brandon L. Rinehart did possess vacuum and suction dredge equipment in the County of Plumas in the Plumas National Forest, and within 100 yards of an area closed to suction dredge mining by the State of California.

"3.     The conduct identified in Paragraphs 1 and 2 occurred within the boundaries of the 'Nugget Alley' placer mining claim owned by Defendant, and

2

registered with the U.S. Bureau of Land Management [(BLM)] with Serial Number CAMC0297113."

The court and the parties next turned to the defendant's assertion of the affirmative defense that section 5653 is unenforceable against him because the statute, as applied, is preempted by federal law.

Defendant made an offer of proof arguing that, if the evidence in the offer of proof was allowed to come before the court, it would establish that section 5653 was unenforceable under the circumstances presented here. The offer of proof was as follows:

1. Defendant would testify that he was working in the water within the boundaries of the "Nugget Alley" mining claim, one of two contiguous mining claims owned by he and his father and four other locators. He would testify that he and his father obtained the claims by making a discovery of a valuable locatable mineral, posting a Notice of Location on the claim as required by law, filing the Location Notice with Plumas County and then transmitting a copy of the file-stamped Location Notice to the U.S. Bureau of Land Management. He would offer as evidence a true copy of the Location Notice. He would testify that the Location Notice identifies, and establishes, upon acceptance by BLM, the boundaries of the claim. He would offer pictures of the claim, and areas where gold is to be found, together with a picture of substantial quantities of gold recovered from the claim.

2. Defendant would testify that BLM accepted the Location Notice and registered the Nugget Alley claim with Serial Number CAMC297113, and offer a true copy of a printout from the BLM LR2000 system, showing that this claim (and the adjacent claims) are in good standing with the United States, all required fees having been paid to all governmental entities. He would testify that the Nugget Alley Claim, though located on land which the federal government has legal title (within the Plumas National Forest), is private property on which he and the other owners pay real estate

3

taxes to Plumas County, and offer a true copy of the most recent tax bill from Plumas County.

3.     He would offer a map of the area and testify that at the time he was cited by the game warden, he was within the boundaries the claim.

4.     Defendant would testify that placer claims, by their nature, contain gold deposited by water bodies.  He would testify that much of California has already been subject to significant mining activity that has extracted the gold near to, but outside of, flowing waters, and that the Nugget Alley claim has been hydraulically mined in the past to remove such gold.

5.     He would testify that he excavated test pits outside the water-covered areas of the claim to survey for the presence of recoverable gold and found no economically-significant quantity of gold outside the water-covered areas.  He would testify that the gold remaining on the claim, and additional gold brought from upstream sources, has been concentrated by flowing waters and may be found beneath the waters of the claim.

6.     He would testify that the only economically-feasible method by which gold can be extracted from the Nugget Alley claim, and indeed most placer claims in California, is by utilizing a suction dredge to extract the gold-bearing streambed material underwater.  He would testify that based on a typical day of five hours/day in the water, he has recovered roughly one-half an ounce of gold per day, roughly $750, but on better days, he would recover an excess of an ounce, and that there is a continuing hope of hitting richer pockets which might lead to recoveries many times that amount.

7.     Defendant would testify that he attempted to use hand shovels and buckets to shovel out gravel from under the flowing water, which would then be processed outside the water by another miner using a highbanker to recover the gold.  He would testify that this process was very difficult to accomplish because, among other things, the flowing water blew most of the gravel off the shovel, and visibility in the hole he was working would diminish to the point where it became unsafe to work.  He attempted one

4

eight-hour day of this activity, laboriously filling 30 buckets of gravel, and this backbreaking labor produced less than a tenth of an ounce of gold.

8.     He would testify that, by contrast, the suction dredge moves and processes the gravel simultaneously without having to lift it out of the water, which is a much faster process in addition to recovering a greater quantity of gold.  By way of comparison, it takes two men eight hours each to recover one-tenth an ounce of gold or less by hand, while a single person working the suction dredge for five hours can recover half an ounce or more.  For this reason, working by hand may be regarded as at least sixteen times less efficient than using the suction dredge.

9.     Defendant would testify that the alternative of digging by hand underwater is not a commercially-viable alternative, insofar as the backbreaking labor cannot be sustained for extended periods and the economic return makes it unprofitable to pursue such an activity.  For all these reasons, defendant would opine that the State's refusal to issue a permit to operate his suction dredge is in substance a prohibition on mining his claim, and certainly represents material interference with his mining activities.

10.     Gerald Hobbs would offer evidence that he has been a miner and prospector for over thirty years, has mined extensively throughout the Western United States, and holds mining claims in California.  He would testify that he has previously testified in litigation as an expert witness regarding suction dredge mining and evaluating stream deposits, and that he has previously taught suction dredge mining techniques and methods not only in California, but in other Western states and abroad.

11.     He would testify that he is the President and Founder of Public Lands for the People, Inc. (PLP), a 501(c)(3) nonprofit educational organization of small and medium size miners and prospectors, with constituent members totally roughly 40,000 people.  He would testify that as a result of his personal mining experience and role with PLP, he has knowledge of both the methods and economics of small and medium-scale mining, and the regulatory system of the State of California and the federal government.

5

12. He would testify that much of California has already been subject to significant mining activity that has extracted placer deposits of gold, and that early miners tended to mine the banks of California rivers and streams, but not underwater deposits. In particular, the technique of hydraulic mining (using a high pressure hose to wash soil deposits near rivers and streams into a sluice) removed much of the gold deposited adjacent to water bodies, but much gold was lost in the process, washed into the rivers and streams, and remains there for subsequent miners. In addition, lode deposits continue to erode and release gold into the rivers and streams, replenishing in stream deposits.

13. Hobbs would testify that he has not yet had an opportunity to visit defendant's claim (but intends to do so if the trial is continued beyond and he is permitted to testify at trial), but has examined photographs of the claim and spoken with defendant concerning its nature.

14. He would testify that assuming the truth of defendant's statements, the only commercially-significant deposits of gold likely present on the claim are located underwater, and that the only practical method of recovering those deposits is to vacuum the gravel up with a suction dredge. In particular, he would confirm that suction dredges are much more efficient at removing and processing gold-bearing gravels, and that mining by hand generally will not produce an economic return because, among other things, the richest deposits that could be profitably mined by hand are long gone. He would also testify that theoretical alternatives such as damming and redirecting entire rivers to expose the river bottom for land-based equipment are not economically - or legally - feasible.

15. He would testify that the typical four-inch suction dredge costs approximately $3,000 or more. Additional support gear, such as a wet-suit, diving gear, weight belts, pry bars, winching gear, chains, tools, and other needed items can cost easily an additional $1,000 or more. The typical small scale placer suction dredge miner

6

has easily $4-5,000 or more invested in equipment alone. The mining industry as a whole has substantial investment in equipment for suction dredging.

16. He would testify that the State's refusal to issue permits for suction dredging makes all this mining capital worth substantially less, and materially interferes with the development of California mineral resources on federal lands and elsewhere as a general matter, and amounts to a prohibition against the mining of the vast majority of federal placer gold claims in Northern California and Southwest Oregon, including defendant's claim.

17. Thomas Kitchar would testify that he has been employed in the field of gold mining as his primary source of income since December of 1979 when he was employed by the Homestake Mining Company (HMC) in Lead, S.D. for nearly four years at depths of over 6800 feet as a hard rock underground gold miner. During that period, he rose through the ranks gaining MSHA certification as an Underground Miner 1st Class, Motorman 1st Class, LHD Operator 1st Class, and Cager 2nd Class. While working for the HMC, in his spare time, he taught himself the practices of the placer gold miner, located claims of his own, and became familiar with, among other things, the U.S. Forest Service mining regulations at 36 C.F.R. 228.

18. He would testify that in the fall of 1984, he ceased working for HMC, and by the fall of 1985 had outfitted himself with small-scale placer mining equipment, including a suction dredge, and moved to SW Oregon with the intent of locating valuable placer gold mining claims and then working them full-time as his sole source of income.

19. He would testify that after several years of prospecting and searching for ground rich enough to work and claim, by 1987 he had located claims along a historically-rich creek near the California border a dozen or so miles from the nearest town. He moved onto one of these claims, and has lived on this claim year-round (26 years) to this day while working this and other nearby and adjacent claims. In the course

7

of his mining work, he has become knowledgeable in the mining techniques employed by defendants and other small scale miners.

20.     Kitchar would testify that in response to baseless environmentalist attacks upon suction dredge mining, in about the year 2000 he joined and got involved with the Waldo Mining District (WMD) to help fight against these threats. In June of 2001, he was elected president of the WMD, and continues to hold that office to this day. WMD was established through self-initiation on April 4, 1852, and later pursuant to provisions of the U.S. Mining Law of 1872, and is a federally recognized mining district with certain governmental authority over mining within the boundaries of the District. The purpose of the WMD is to preserve, protect, and promote mining within the District and elsewhere. The District is based in Cave Junction, Oregon.

21.     Both as a miner and as president of the WMD, he has become familiar with the regulatory provisions concerning suction dredge mining. He has published a book entitled "The Gold Prospector's Guide to Researching and Locating Mining Claims," and has testified in numerous judicial and regulatory proceedings concerning suction dredge mining at both the state and federal level.

22.     He would testify that much of Southwest Oregon and Northern California has already been subject to significant mining activity that has extracted placer deposits of gold, and that earlier miners tended to mine the banks of rivers and streams, and sometimes even the beds of those streams if they were not too deep, but that they could not mine the deeper underwater deposits. In particular, the technique of hydraulic mining (using a high pressure hose or monitor to wash soil deposits near rivers and streams into a sluice) removed much of the gold deposited adjacent to water bodies, but much of the gold was lost in the process, washed into the rivers and streams with the tailings where it has been reconcentrated and deposited, and remains there for subsequent miners. In addition, upland lode and placer deposits continue to erode and release gold into the rivers and streams, replenishing in-stream deposits.

8

23.     He would testify that gold, because of its high specific gravity, tends to deposit in certain areas of live running streams, and has the tendency to sink down though the bed materials until it reaches some impervious layer, usually the underlying bedrock. In general, the closer the miner gets to the bedrock, more gold will be recovered with the best pay being found on the bedrock or in cracks in the bedrock. The modern suction dredge is the most efficient tool yet devised, and the only practical tool, for recovering gold from underwater bedrock cracks.

24.     He would testify that he has not visited defendant's claim, but has examined photographs of the claim.

25.     He would testify that assuming the truth of defendant's statements, the only commercially-significant deposits of gold likely present on the claim are located underwater, and that the only practical method of recovering those deposits is to vacuum the gravel up with a suction dredge. In particular, he would confirm that suction dredges are much more efficient at removing and processing instream gold-bearing gravels, and that mining by hand generally will not produce an economic return because, among other things, the richest deposits that could be profitably mined by hand are long gone or too far underwater. He would also testify that theoretical alternatives such as damming and redirecting entire rivers to expose the river bottom for land-based equipment are not economically - or legally - feasible.

26.     He would testify that the typical four-inch suction dredge costs approximately $3,000 or more. Additional support gear, such as a wet-suit, diving gear, weight belts, pry bars, winching gear, chains, tools, and other needed items can cost easily an additional $1,000 or more. The typical small scale placer suction dredge miner has easily $4-5,000 or more invested in equipment alone. The mining industry as a whole has substantial investment in equipment for suction dredging.

27.     He would testify that the State's refusal to issue permits for suction dredging makes all this mining capital worth substantially less, and materially interferes

with the development of California mineral resources on federal lands and elsewhere as a general matter, and amounts to a prohibition against the mining of the vast majority of federal placer gold claims in California, including defendant's claim.

The parties stipulated that defendant had permits as required by the law when they were available and would have continued to apply for such permits if permits were being issued. The parties further stipulated that the court could accept into evidence a document entitled "California Department of Fish and Wildlife Report to the Legislature Regarding Instream Suction Dredge Mining Under the Fish and Game Code" dated April 1, 2013.

After extensive argument by both parties and questioning by the court, the trial court held that prosecution of defendant for violations of section 5653, subdivisions (a) and (d) was not barred on the grounds that the provisions of the statute, and therefore its enforcement, are preempted by federal law. The court allowed into evidence defendant's proposed testimony set forth in paragraphs 1 through 5 of the offer of proof, but, based upon the court's ruling on the affirmative defense of preemption, excluded the testimony set forth in paragraphs 6 through 9, and excluded the proposed testimony of Hobbs and Kitchar.

The court found defendant guilty of Count I and Count II of the complaint, suspended imposition of sentence, and ordered that defendant be placed on three years summary probation. The court also ordered defendant to pay certain fines and fees but stayed payment of the fines pending successful completion of probation.

On August 15, 2013, the appellate division of the Superior Court of Plumas County certified this case for transfer to this court pursuant to rule 8.1005, California Rules of Court. On October 4, 2013, this court transferred the matter to this court for purposes of appeal.

On appeal, defendant contends the trial court erred when it rejected his defense that enforcement of the provisions of Fish and Game Code sections 5653 and 5653.1,

10

operating together, are preempted by federal law. He further contends the trial court erred by excluding evidence that the state's de facto refusal to issue suction dredge mining permits required by section 5653 results in an unconstitutional interference with his federally-protected mining rights. As noted earlier, we will reverse the judgment and remand the matter to the trial court for further proceedings on the issue of federal preemption.

DISCUSSION

I

*Fundamental Principles of Federal Preemption*

We turn first to certain fundamental principles of the law of federal preemption as they relate to Congress' authority over federal lands.

The Property Clause of the United States Constitution "provides that 'Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.' U.S. Const., Art IV, § 3, cl. 2." The United States Supreme Court has " 'repeatedly observed' that ' [the] power over the public land thus entrusted to Congress is without limitations.' " (*Kleppe v. New Mexico* (1976) 426 U.S. 529, 535, 539 [49 L.Ed.2d 34, 41, 43], quoting *United States v. San Francisco* (1940) 310 U.S. 16, 29 [84 L.Ed.1050, 1059-1060].)

Even so, " 'the State is free to enforce its criminal and civil laws' on federal land so long as those laws do not conflict with federal law. [Citation.] The Property Clause itself does not automatically conflict with all state regulation of federal land. Rather, . . . '[a]bsent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power *to enact legislation* respecting those lands pursuant to the Property Clause. *And when Congress so acts*, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.' [Citation.]" (*California Coastal Comm'n v. Granite Rock* (1987) 480 U.S. 572,

11

580-581 [94 L.Ed.2d 577, 591] citing *Kleppe v. New Mexico, supra*, at p. 543 (*Granite Rock*; italics added.)  Put differently, "[T]he Property Clause gives Congress plenary power over . . . federal land . . .; however, even within the sphere of the Property Clause, state law is pre-empted only when it conflicts with the operation or objectives of federal law . . . [Citation.]"  (*Id*. at p. 593 [94 L.Ed.2d at pp. 599-600].)

"[S]tate law can be pre-empted in either of two general ways.  If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted.  [Citations.]  If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law [citation] or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, [citation]."  (*Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 248 [78 L.Ed.2d 443, 452]; see also, *Viva!, supra,* 41 Cal.4th at pp. 935-936.)

## II

### *Federal Mining Law*

The federal government's policy relating to mining and minerals is set forth at Title 30 United States Code section 22.  "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States . . . under regulations prescribed by law, and according to the local customs and rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States."

We deal here mainly with the Mining Act of 1872.

"Under the Mining Act of 1872, 17 Stat. 91, as amended, 30 USC § 22 et seq., a private citizen may enter federal lands to explore for mineral deposits. If a person locates a valuable mineral deposit on federal land, and perfects the claim by properly staking it and complying with other statutory requirements, the claimant 'shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations,' [citation], although the United States retains title to the land. The holder of a perfected mining claim may secure a patent to the land by complying with the requirements of the Mining Act and regulations promulgated thereunder [citation] and, upon issuance of the patent, legal title to the land passes to the patent holder." (*Granite Rock, supra,* at pp. 575- 576 [94 L.Ed.2d at p. 588].)

The United States Supreme Court has recognized that the intent of Congress in passing the mining laws "was to reward and encourage the discovery of minerals that are valuable in an economic sense." (*United States v. Coleman* (1968) 390 U.S. 599, 602 [20 L.Ed.2d 170, 174-175].)

Constitutionally speaking, under most circumstances, the states are free to enact environmental statutes and regulations binding on those holding unpatented mining claims on federal lands so long as those statutes and regulations do not rise to the level of impermissible state land use regulations. (See *Granite Rock, supra,* 480 U.S. 572 [94 L.Ed.2d 577].) "The line between environmental regulation and land use planning will not always be bright; for example, one may hypothesize a state environmental regulation so severe that a particular land use would become commercially impracticable. However, the core activity described by each phrase is undoubtedly different. Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." (*Id*. at p. 587 [94 L.Ed.2d at pp. 595-596].)

13

## III

*California Fish and Game Code Sections 5653 and 5653.1*

In 1961, the State of California enacted section 5653 directing the California Department of Fish and Wildlife (formerly known as the Department of Fish and Game) (Department) to issue permits if it determined the particular vacuum or suction dredge mining operation "will not be deleterious to fish." (Stats. 1961, ch. 1816, § 1.) Suction dredging is the use of a suction system to remove and return materials from the bottom of a stream, river or lake for the extraction of minerals. (Cal. Code Regs., tit. 14, § 228.)

In 1988, amendments to the statute made it a misdemeanor to possess a vacuum or suction dredge in or within 100 yards of waters closed to the activity. (Stats. 1988, ch. 1037, § 1.)

In August 2009, the Governor signed Senate Bill No. 670, prohibiting the Department from issuing any new permits under section 5653, and imposing a statewide moratorium on instream suction dredge mining to remain in effect pending completion of the Department's administrative proceedings undertaken pursuant to section 5653.1. (Stats. 2009, ch. 62, § 1, adding former Fish & G. Code, § 5653.1, eff. Aug. 6, 2009.)

In 2011, the Legislature amended section 5653.1 to state that the statutory moratorium would end on the earlier of June 30, 2016, or the Department's certification that the following five conditions had been satisfied:

"(1) The [D]epartment has completed the environmental review of its existing [1994] suction dredge mining regulations. . . .

"(2) The [D]epartment has transmitted for filing with the Secretary of State . . . a certified copy of new regulations adopted, as necessary, pursuant to . . . the Government Code.

"(3) The new regulations described in paragraph (2) are operative.

14

"(4) The new regulations described in paragraph (2) fully mitigate all identified significant environmental impacts.

"(5) A fee structure is in place that will fully cover all costs to the [D]epartment related to the administration of the program." (See former Fish & G. Code, § 5653.1, subd. (b), later amended by Stats. 2012, ch. 39, § 7, eff. June 27, 2012.)

Section 5653.1 "applies solely to vacuum and suction dredging activities conducted for instream mining purposes," but "does not expand or provide new authority for the [D]epartment to close or regulate suction dredging conducted for regular maintenance of energy or water supply management infrastructure, flood control, or navigational purposes governed by other state or federal law." (§ 5653.1, subd. (d).) Section 5653.1 "does not prohibit or restrict nonmotorized recreational mining activities, including panning for gold." (§ 5653.1, subd. (e).)

A subsequent amendment to the statute repealed the June 30, 2016 date, such that the moratorium now ends when the Department certifies that all five conditions have been satisfied. (Stats. 2012, ch. 39, § 7, eff. June 27, 2012.)

Defendant argues that, because of a lack of funding, the Department is unable for financial reasons to fulfill the conditions set forth in section 5653.1 which results in a continuing, if not permanent, moratorium on suction dredge mining permits. This, he argues, stands as an obstacle to federal Congressional intent. To the argument that such permits may be issued again at some point in the future, defendant responds that, in any event, to accept that argument would be to allow any moratorium to stand on the promise that it would be lifted in the future. Defendant also argues that, where the Government has authorized a specific use of federal lands, a state may not prohibit that use, either temporarily or permanently, in an attempt to substitute its judgment for that of Congress.

15

## IV

### *Resolution of this Appeal*

The question presented here is whether sections 5653 and 5653.1 of the Fish and Game Code, as presently applied, stand as an obstacle to the accomplishment of the full purposes and objectives of Congress in passing the federal mining laws.

We first note that section 5653 requiring a permit from the state before persons may conduct suction dredge mining operations does not, standing alone, contravene federal law. (See *Granite Rock, supra,* 480 U.S. 572 [94 L.Ed.2d 57].) *Granite Rock* establishes that the requirement of a state permit to conduct certain activities on federal land is not categorically prohibited. The issue turns instead on the conditions attending the permit.

The question here is whether the requirements of section 5653.1, which requirements, defendant argues, cannot at the present time be met by the state, in fact operate to prohibit the issuance of a permit under section 5653. That is, according to defendant, there is at the current time a de facto ban on suction dredge mining in California imposed by the state through the operation of sections 5653 and 5653.1. Moreover, according to defendant, there is no economically feasible way to extract valuable mineral deposits at the sight of his claim. Put simply, according to defendant, this combination of circumstances has the practical effect of the state taking away from him what the federal government has granted. Therefore, he argues, the state statutes are unenforceable because their operation, as to defendant, is preempted by federal law.

In addressing this question, we find particularly useful the opinion of the United States Court of Appeals for the Eighth Circuit in *South Dakota Mining Ass'n Inc. v. Lawrence County* 155 F.3d 1005 (8th Cir. 1998) (*South Dakota Mining*). Indeed, *South Dakota Mining* is nearly directly on point here.

16

In *South Dakota Mining*, the voters of Lawrence County, South Dakota enacted an ordinance prohibiting the issuance of new or amended permits for surface metal mining in what was known as the Spearfish Canyon Area.  Plaintiffs in the action to permanently enjoin enforcement of the ordinance included mining companies that held federally patented and unpatented mining claims in the area and had conducted surface mining operations consistent with federal law within Lawrence County for the 15 years before the ordinance was enacted.  (*Id.* at p. 1007.)

The record in the district court showed that surface metal mining was the only mining method that had been used to mine gold and silver deposits in the area for the previous 20 years.  The record also showed that surface metal mining was the only mining method that could extract gold and silver within the Spearfish Canyon area even though, in other parts of South Dakota, underground and other types of gold and silver mining were prevalent.  Surface metal mining in the Spearfish Canyon area was the only mining method available, as a practical matter, because the gold and silver deposits in that area were located, geologically, at the earth's surface.  The record showed that the mining companies had invested substantial time and money to explore the area for mineral deposits and to develop mining plans that conformed to federal, state, and local permitting laws.  (*South Dakota Mining, supra,* at pp. 1007 to 1008.)

The district court permanently enjoined enforcement of the ordinance holding that the Federal Mining Act of 1872 preempted the ordinance.  (*South Dakota Mining, supra,* at p. 1008.)

The Eighth Circuit Court of Appeals affirmed the district court's order.  The court first found that the purposes and objectives of the Congress in passing the Mining Act of 1872 included "the encouragement of exploration for and mining of  valuable minerals located on federal lands, providing federal regulation of mining to protect the physical environment while allowing the efficient and economical extraction and use of minerals,

17

and allowing state and local regulation of mining so long as such regulation is consistent with federal mining law." (*South Dakota Mining, supra,* at p. 1010.)

The court then found that "[t]he Lawrence County ordinance is a per se ban on all new or amended permits for surface metal mining within the area. Because the record shows that surface metal mining is the only practical way any of the plaintiffs can actually mine the valuable mineral deposits located on federal land in the area, the ordinance's effect is a de facto ban on mining in the area. [¶] . . . [¶]

"The ordinance's de facto ban on mining acts as a clear obstacle to the accomplishment of the Congressional purposes and objectives embodied in the Mining Act. Congress has encouraged exploration and mining of valuable mineral deposits located on federal land and has granted certain rights to those who discover such minerals. Federal law also encourages the economical extraction and use of these minerals. The Lawrence County ordinance completely frustrates the accomplishment of these federally encouraged activities. A local government cannot prohibit the lawful use of the sovereign's land that the superior sovereign itself permits and encourages. To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution. The ordinance is prohibitory, not regulatory, in its fundamental character." (*South Dakota Mining, supra,* at p. 1011.)

The matter before us is distinguishable from *South Dakota Mining* in that sections 5653 and 5653.1 of the Fish and Game Code, read together or alone, do not *expressly* prohibit the issuance of suction dredge mining permits. But in the last analysis, that has no bearing on the result we reach here. While the sections at issue in the Fish and Game Code do not expressly ban suction dredge mining, they do require a state permit for such mining and, arguably, California law as embodied in the words and application of section 5653.1 acts to prevent the issuance of such permits. Defendant argues that, in practical operation, sections 5653 and 5653.1, have, since 2009, banned suction dredge mining in California. Since, according to defendant, there is no commercially viable way to

18

discover and extract the gold or other minerals lying within defendant's mining claims other than suction dredge mining, the effect of the statutory scheme is to deprive him of rights granted to him under federal law.

Put differently, and in the language of the hypothetical used by the Court in *Granite Rock*, if sections 5653 and 5653.1 are environmental regulations that are "so severe that a particular land use [in this case mining] . . . become[s] commercially impracticable" (*Granite Rock, supra,* at p. 587), then they have become de facto land use planning measures that frustrate rights granted by the federal mining laws and, thus, have become obstacles to the realization of Congress' intent in enacting those laws. If that is the case, as defendant alleges, the Fish and Game Code provisions at issue here are unenforceable as preempted by federal mining law.

While defendant has made a colorable argument to that end, we cannot determine on this record that, as a matter of law, the criminal provisions of section 5653, read in light of the provisions of section 5653.1, are rendered unenforceable because the California statutes have rendered the exercise of rights granted by the federal mining laws "commercially impracticable." (*Granite Rock, supra,* at p. 587.)

The trial court held that the relevant Fish and Game Code sections were not preempted by federal law and disallowed evidence relevant to the question before us. Having no evidence in the record relevant to the operative issues bearing on defendant's affirmative defense, we must return the matter to the trial court for further proceedings on the issue of preemption, admitting whatever evidence, and hearing whatever argument, the trial court, in its discretion, deems relevant and then ruling accordingly. Specifically, the trial court must address at least these two questions: (1) Does section 5653.1, as currently applied, operate as a practical matter to prohibit the issuance of permits required by section 5653; and (2) if so, has this de facto ban on suction dredge mining permits rendered commercially impracticable the exercise of defendant's mining rights granted to him by the federal government?

19

Remand is not only necessary because these questions cannot be answered by a review of the record of trial we have before us but also because it is fair to the defendant and to the People as each party may have evidence beyond the offer of proof and argument it wishes to offer beyond that which has thus far been offered in the trial court on the issue of federal preemption.

DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for further proceedings.


      HULL      , Acting P. J.


We concur:


     ROBIE    , J.


     HOCH    , J.

Filed 10/8/14

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON LANCE RINEHART,<br><br>      Defendant and Appellant. | C074662<br><br>(Super. Ct. No. M1200659)<br><br><br>ORDER OF PUBLICATION |

APPEAL from a judgment of the Superior court of Plumas County, Ira Kaufman, Judge.  Reversed and remanded.

Murphy & Buchal, James L. Buchal for Defendant and Appellant.

Pacific Legal Foundation, Damien M. Schiff and Jonathan Wood for Pacific Legal Foundation and The Western Mining Alliance as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Gavin G. McCabe, Supervising Deputy Attorney General, Michael M. Edson, Marc N. Melnick and J. Kyle Nast, Deputy Attorneys General for Plaintiff and Respondent.

1

Center for Biological Diversity, Jonathan Evans and Saxton & Associates, Lynne R. Saxton for Karuk Tribe, Center for Biological Diversity, Friends of the River, Klamath Riverkeeper, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, California Sportfishing Protection Alliance, Foothill Angler's Coalition, North Fork American River Alliance, Upper American River Foundation, and Central Sierra Environmental Resource Center as Amici Curiae on behalf of Plaintiff and Respondent.

THE COURT:

The opinion in the above-entitled matter filed on September 23, 2014, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

     HULL     , Acting P. J.


     ROBIE     , J.


     HOCH     , J.