FILED
United States Court of Appeals
Tenth Circuit

December 8, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF OTERO,

     Defendant - Appellant,

and

STATE OF NEW MEXICO,

     Defendant.

------------------------------

PACIFIC LEGAL FOUNDATION,

     Amicus Curiae.

No. 15-2210

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:12-CV-00120-MCA-SMV)**
_____

Dori E. Richards (A. Blair Dunn, with her on the briefs), Western Agriculture, Resource and Business Advocates, LLP, Albuquerque, New Mexico, for Appellant.

David C. Shilton (Nicholas L. Pino, USDA Office of General Counsel, Albuquerque, New Mexico, John C. Cruden, Assistant Attorney General, and Andrew A. Smith, with

him on the brief), Environment and Nat. Res. Div., U.S. Department of Justice, Washington, D.C., for Appellee.

John M. Groen and Anthony L. François, Pacific Legal Foundation, Sacramento, California, filed an Amicus Curiae brief in support of Appellant.

_____

Before **HARTZ**, **HOLMES**, and **MATHESON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

A New Mexico statute and a resolution adopted by the Otero County Board of County Commissioners purported to authorize the Board to mitigate fire danger in the Lincoln National Forest without first obtaining permission from the U.S. Forest Service. The United States obtained a judgment from the United States District Court for the District of New Mexico invalidating the statute and the resolution. The Board appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The Property Clause of the United States Constitution authorizes the federal government to promulgate regulations governing use of national forest lands; and under the Constitution's Supremacy Clause and binding precedent, those regulations prevail over any contrary state or local law.

## I.    BACKGROUND

In recent years New Mexico has suffered from major fires originating on federal land within the state. Apparently in response to a devastating fire that consumed many homes in the city of Los Alamos, the state legislature in 2001 enacted a statute authorizing self-help by local communities. Recognizing "inaction on the part of the forest service to appropriately reduce, if not remove, the risk to the lives and property of

2

the citizens of New Mexico," the statute enabled "a board of county commissioners for a county in which a disaster has been declared . . . [to] take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster" after, among other things, consulting with the Forest Service. N.M. Stat. Ann. § 4-36-11(A)(2), (C) 1978.[1]

---

[1] The statute provides in full:

A. The legislature finds that:

(1) numerous citizens and government officials in the state of New Mexico have repeatedly petitioned the United States forest service both collectively and individually at public meetings, by correspondence and by telephone to request that the forest service take appropriate action to remove or eliminate the conditions that have created a state of emergency caused by a present risk to the lives and property of citizens in and adjacent to national forests within New Mexico;

(2) all the petitions have for all practical purposes been either ignored or discounted by the United States forest service resulting only in what can be reasonably characterized as *inaction on the part of the forest service to appropriately reduce, if not remove, the risk to the lives and property of the citizens of New Mexico*;

(3) because the United States forest service has failed to exercise its responsibilities as a sovereign to protect the lives and property of the citizens of New Mexico and because it is a fundamental principle under the laws of any just society that the persistent failure of a sovereign to fulfill such obligations constitutes grounds for the forfeiture of jurisdictional supremacy, such a forfeiture must hereby be recognized and declared; and

(4) because of recognition and declaration of this forfeiture of jurisdictional supremacy, a jurisdictional vacuum has been created that requires the state of New Mexico to acknowledge its obligations as a sovereign power to protect the lives and property of its citizens and consequently to authorize any action it presently deems necessary to fill the vacuum created by the federal government by assuming jurisdiction to reduce to acceptable levels,

3

Fire danger from federal land was a significant concern in Otero County, where over 75% of the land is owned by the United States. On May 6, 2011, the Sacramento Ranger District issued a letter "closing the Lincoln National Forest due to the drought and extremely high fire risk." Cty. Resolution, Aplt. App., Vol. I at 30. The Board followed suit on May 23, passing a resolution declaring "a state of emergency and disaster . . . in and around the communities and watersheds in the Sacramento Mountains." *Id.* at 31. The resolution noted the County's statutory authority to take any necessary action to remove hazardous vegetation within the area after consulting with the Forest Service.[2]

---

if not remove, the threat of catastrophic fires posed by present conditions in national forests within its borders.

B. The legislature declares a disaster within those areas of the national forests of New Mexico that suffered severe fire damage, as determined by the local board of county commissioners, where large amounts of forest undergrowth have created the potential for damaging fires in the future. The legislature also declares that the disaster is of such magnitude that the police power of the state should be exercised to the extent necessary to provide the resources and services that will end the disaster and mitigate its effects.

C. *After consulting with the state forester and the regional United States forester, taking surveys, holding those public hearings as may be necessary and developing a plan to mitigate the effects of the disaster, a board of county commissioners for a county in which a disaster has been declared pursuant to Subsection A of this section may take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster.* A county may enter into an agreement with a contractor, licensee or other agent to carry out the purposes of this subsection.

N.M. Stat. Ann. § 4-36-11 (emphasis added).

[2] The relevant provision of the resolution provides:

The Board retained a consultant to prepare a plan to mitigate the danger. The plan proposed to "restore" 69,000 acres in the Lincoln National Forest by extracting "small and medium size . . . standing live and dead trees and wood materials." Dist. Ct. Summ. J. Opinion, Aplt. App., Vol. II at 388 (Dist. Ct. Op. at 4) (internal quotation marks omitted). A modified plan called for the "treatment of 1,200 to 1,500 acres . . . in an area within Mexican Spotted Owl (MSO) habitat with MSO present in the area." Dist. Ct. Op. at 8 (internal quotation marks omitted). The Board decided to implement the plan and notified the Forest Service. The Forest Service did not approve the proposed measures.

When the Board indicated that it was going to execute the plan anyway, the United States sued the Board and the State of New Mexico in federal court seeking a declaration that the resolution and its enabling statute were preempted by conflicting federal law. The United States also sought to enjoin public officials from implementing the plan on federal lands without prior approval from the Forest Service. It relied on federal

---

**BE IT FURTHER RESOLVED** that the Board of County Commissioners hereby formally notifies State and Federal officials that pursuant to NMSA 1978 §4-36-11 C. it is empowered to, after consulting with the State Forester and the Regional United States Forester, taking surveys, holding those public hearings as may be necessary and developing a plan to mitigate the effects of the disaster, as a county in which a disaster has been declared pursuant to Subsection A of NMSA 1978 §4-36-11 may take such actions as are necessary to clear and thin undergrowth and to remove or log fire-damaged trees within the area of the disaster. Otero County may also enter into an agreement with a contractor, licensee or other agent to carry out the purposes of NMSA 1978 §4-36-11.

Cty. Resolution, Aplt. App., Vol. I at 31.

5

regulations requiring Forest Service consent before anyone could cut, damage, or remove trees or brush from a national forest.

The district court granted summary judgment to the United States. The court first ruled that because the threatened injury (actions on federal land without Forest Service approval) was impending at the time of suit, the United States had standing and its claims were ripe for adjudication. On the merits the court held that "the Property Clause grants the federal government plenary power over federal lands, and consequently . . . the Tenth Amendment does not reserve an exclusive sovereign right to New Mexico to regulate federal lands in contravention of federal law." *Id.* at 9. The state statute and local resolution thus were preempted under the Supremacy Clause, as they conflicted with federal law. The court rejected the State's suggested construction of the statute to make it consistent with federal law, saying that the suggested construction was contrary to "the statute's plain and unambiguous language [and] its legislative intent." *Id.*

The Board, but not the State, appeals. It does not challenge the district court's rulings on standing and ripeness. And, consistent with the position it took in the district court, it offers no argument that the resolution or statute can be read in a manner consistent with federal law. It frames the sole issue on appeal as: "[D]oes the Property Clause of the United States Constitution so thoroughly preempt state power that a state may not, under any circumstances, remove a deadly and destructive nuisance from National Forest lands even where the United States refuses or fails to remove that danger itself[?]" Aplt. Reply Br. at 1.

6

## II. DISCUSSION

There is no dispute that a local government can ordinarily exercise its police powers to mitigate fire danger within its territorial boundaries. But a federal regulation promulgated by the Department of Agriculture requires permission of the Forest Service before anyone can "[c]ut[] or otherwise damag[e] any timber, tree, or other forest product" in a national forest. 36 C.F.R. § 261.6(a) [(2016)]. The Board has not questioned the statutory authority to promulgate the regulation. The issue before us is solely one of constitutional power. The constitutional authority invoked by the United States is the Property Clause, which states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

Although the United States has title to the Lincoln National Forest, the Board contends that the federal government's power over that land under the Property Clause must be limited. It says that the federal regulation at issue here reaches beyond the proper scope of the Property Clause because it "deprives the State of New Mexico and Otero County of the ability to protect the health, safety and welfare of their citizens . . . , skewing the 'healthy balance of power' between the States and the Federal government." Aplt. Br. at 33. According to the Board, "It is both troubling and nearly inconceivable . . . that the federal government would have unfettered and absolute authority over lands not expressly proclaimed by the Constitution as necessary for federal governance." *Id.* at 23–24. In particular, it says, the Property Clause does not grant the federal government

7

"absolute, unfettered plenary power" to prohibit the States from taking measures they deem necessary "to protect their citizens from impending harm." *Id.* at 40–41. This power not being conveyed to the federal government, the argument continues, it must be reserved to the States under the Tenth Amendment. *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). Thus, when, as in this case, "the United States fails or refuses to remove from federal lands a condition that poses an imminent threat of extreme danger to the life and property of a state's citizens, . . . the Tenth Amendment reserves to the state powers sufficient to take reasonable, minimally invasive steps to abate the dangerous condition." Aplt. Reply Br. at 7.

Binding precedent requires us to reject the Board's argument. The Supreme Court, followed by this court, has declared that the Property Clause gives the federal government plenary power, including legislative and police power, over federal property. Although state and local governments can ordinarily exercise their police powers over federal land within their boundaries, those powers must yield under the Supremacy Clause when they conflict with federal law under the Property Clause.

We begin with the Supreme Court's decision in *Kleppe v. New Mexico*, 426 U.S. 529 (1976), which reviewed the constitutionality of the Wild Free-Roaming Horses and Burros Act (Wild Horses Act), 16 U.S.C. §§ 1331–1340. Congress passed the Act "to protect all unbranded and unclaimed horses and burros on public lands of the United States" and specified that "all such horses and burros on the public lands administered by

8

the Secretary of the Interior . . . or by the Secretary of Agriculture . . . are committed to the jurisdiction of the respective Secretaries." *Kleppe*, 426 U.S. at 531 (internal quotation marks omitted). Seeking to exercise control over wild horses and burros on federal lands, the State of New Mexico sought a declaration that the Act was unconstitutional. *See id.* at 534. It argued in part that the Act could not be sustained under the Property Clause because "[t]he statute is aimed at protecting the wild horses and burros, not at protecting the land they live on." *Id.* at 535 (internal quotation marks omitted).

In rejecting the State's argument, the Court described the scope of the Property Clause in broad terms. It stated that "Congress exercises the powers both of a proprietor and of a legislature over the public domain" and that "even over public land within the States, [t]he general government doubtless has a power over its own property analogous to the police power of the several states." *Id.* at 540 (internal quotation marks omitted). To be sure, the Court observed that "the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved." *Id.* at 539. The uncertainty to which it referred, however, appears to concern not power over federal land but power over property outside federal land. Two paragraphs earlier the Court had discussed *Camfield v. United States*, 167 U.S. 518 (1897), which recognized authority to regulate "fences built on private land adjoining public land when the regulation is for the protection of the federal property." *Kleppe*, 426 U.S. at 538. Although the Court quoted language from *Camfield* noting limits on federal power, it concluded by saying: "*Camfield contains no suggestion of any limitation on Congress' power over conduct on*

9

*its own property*; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits." *Id.* (emphasis added). Indeed, the Court said that it had "repeatedly observed that [t]he power *over the public land* thus entrusted to Congress *is without limitations.*" *Id.* at 539 (emphasis added) (internal quotation marks omitted). It noted that in a prior decision the Court had said "that the Property Clause gives Congress the power over the public lands 'to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon which others may obtain rights in them . . . .'" *Id.* at 540 (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917)). The Court upheld the Wild Horses Act as falling within "the complete power that Congress has over public lands," which "includes the power to regulate and protect the wildlife living there." *Id.* at 540–41 (internal quotation marks and footnote omitted).

*Kleppe* confronted and rejected the argument (an argument quite similar to one made by the Board) "that if we approve the Wild [Horses] Act as a valid exercise of Congress' power under the Property Clause, then we have sanctioned an impermissible intrusion on the sovereignty, legislative authority, and police power of the State." *Id.* at 541. The Court's response was short and categorical: "The Federal Government does not assert exclusive jurisdiction over the public lands in New Mexico, and the State is free to enforce its criminal and civil laws on those lands. But where those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede." *Id.* at 543.

In *Wyoming v. United States*, 279 F.3d 1214 (10th Cir. 2002), this circuit applied *Kleppe*'s reasoning to another Tenth Amendment challenge to a federal regulation based on the Property Clause. The challenge arose from a disagreement between the State of Wyoming and the federal government over how to address a disease that was afflicting elk on federal lands and posing a threat to domestic cattle. *See id.* at 1218, 1219–22. Wyoming filed suit against the United States and the Secretary of the Interior claiming that the federal government had interfered with its "'sovereign right' to manage wildlife within its borders" when the federal government refused to allow the State to vaccinate elk on federal land. *Id.* at 1222.

Wyoming challenged the federal government's actions on the ground that the Tenth Amendment reserves to the States "the right to manage wildlife on [federal land] to protect its own wildlife and domestic livestock." *Id.* at 1224. We observed that although the States historically have possessed broad powers over wildlife (even on federal lands), the Supreme Court had ruled that those powers must yield under the Supremacy Clause when they conflict with federal law enacted under the Property Clause. *See id.* at 1226–27. We repeated the Supreme Court's declaration that "Congress' power [over federal land] is 'plenary,'" *id.* at 1227 (quoting *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987)), and we noted *Kleppe*'s holding that the Property Clause allows Congress to regulate and protect wildlife living on federal lands, *see id.* In our view, "the point [was] painfully apparent that the Tenth Amendment does not reserve to the State of Wyoming the right to manage wildlife, or more specifically vaccinate elk, on [federal

11

land].” *Id.*; *see also id.* at 1226 (“If the Constitution delegates to Congress the power to exercise management authority over federal land, including the wildlife thereon, ‘the Tenth Amendment expressly disclaims any reservation of that power to the States.’” (quoting *New York v. United States*, 505 U.S. 144, 156 (1992))).

The Board argues that these declarations are based on a misunderstanding of constitutional history and are nonbinding dicta because they did not address the compelling local interests at stake in this case. We are not persuaded. Perhaps the statements about the unlimited power of the federal government over its lands could be considered dicta because they are somewhat broader than necessary to resolve the disputes before the courts. *See Cohens v. Virginia* 19 U.S. 264, 399 (1821) (“It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they might be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.”); *cf.* Bryan A. Garner et al., The Law of Judicial Precedent, 61 (2016) (noting “the degree of judgment that goes into classifying a court’s reasoning as holding or dictum”). But each statement was fully considered, went to the core of the issue under review, and was the explicit basis for the decision. *See* Garner at 51 (“The distinction between a holding and a dictum . . . [depends] on whether the solution of the particular point was more or less necessary to determining the issues involved in the case.”) And the statements by the Supreme Court are entitled to great weight even if technically dicta; we have regularly followed statements of the Court that

12

clearly were not holdings. *See, e.g.*, *Peterson v. Martinez*, 707 F.3d 1197, 1209–11 (10th Cir. 2013) (following dictum in *Robertson v. Baldwin*, 165 U.S. 275 (1897), in part because dictum had not been "enfeeble[d]" by recent jurisprudence); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996); *see generally* Garner at 69–70 ("[N]ot all dicta are created equal. Intermediate courts typically treat higher courts' dicta—those in vertical precedents—with greater respect than their own, not only because of the position of the higher court, but also because today's dicta are an indication of what may well be tomorrow's binding precedent." (footnote omitted)). We have no authority to reject the reasoning behind a Supreme Court holding—whether based on questionable logic or history—and we see nothing in Supreme Court opinions suggesting that the Court might limit its precedents declaring that the federal power at issue here is "plenary," *Granite Rock*, 480 U.S. at 581, and "without limitations," *Kleppe*, 426 U.S. at 539 (internal quotation marks omitted).

The district court properly rejected the Board's argument that state law can escape preemption if the general purposes behind state and federal law diverge. It observed that the Supreme Court has "held that . . . the purpose of the laws, whether parallel or divergent, is not relevant to the preemption inquiry." Dist. Ct. Op. at 46. As the Supreme Court said in *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963), it "has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations and has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar," *id.* at 142 (citations

13

omitted). "The test," it said, "of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." *Id.* Thus, it makes no difference that the federal purpose may be, say, protection of the habitat of an endangered or threatened species whereas the Board's interest is protection of human life and home. When different governments differ in their assessment of danger, one must prevail, and the Supremacy Clause says that in these circumstances it must be the United States. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."). As the Supreme Court said in *Kleppe*, "A different rule would place the public domain of the United States completely at the mercy of state legislation." 426 U.S. at 543 (internal quotation marks omitted).[3]

## III.   CONCLUSION

We AFFIRM the decision of the district court. The New Mexico statute and the County resolution must yield to federal law regarding conduct on federal land. In its

---

[3] The County may have a right to take action when the fire danger is immediate. The government has suggested in this case that self-help is permitted in an emergency. *See* Aplee. Fed. R. App. P. 28(j) Letter of 9/28/16 at 1–2 (under federal regulation, "the County could respond to an actual wildfire emergency without prior authorization so long as it applies for a special use permit at the earliest opportunity"); *cf. McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day . . . ."); *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014) ("A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm."). We express no view on the government's suggestion. The important point for present purposes is that any exception to the broad sweep of the federal regulation must come from federal, not state or local, law.

14

amicus curiae brief in support of the Board, Pacific Legal Foundation argues that the County can hold the Forest Service liable under federal common law for maintaining a public nuisance (extreme fire risk) on federal land. But that issue is not properly before us, because it has not been raised by a party. *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997) (declining to address previously unraised argument in amicus curiae brief because framing of the issues on appeal is "a prerogative more appropriately restricted to the litigants"). For the same reason, we do not address whether the Board may obtain relief under the Administrative Procedure Act (APA). *See Wyoming*, 279 F.3d at 1239 (State may pursue relief under APA regarding federal government's denial of State's request to vaccinate elk on federal land). The sole issue before us is whether federal law preempts the state statute and County resolution. We hold that it does.